DUPLER and husband, Appellants, v. SEUBERT and others, Respondents.

*No. 485. Submitted June 2, 1975.—Decided June 30, 1975.*
(Also reported in 230 N. W. 2d 626.)

374

For the appellants the cause was submitted on the brief of *David Rabinovitz* and *Rabinovitz & Sonnenburg,* all of Sheboygan.

For the respondents the cause was submitted on the brief of *Fred D. Huber, Jr.* of Milwaukee and *Robert L. Rohde* and *Federer, Grote, Rohde, Neuses & Dales,* all of Sheboygan.

WILKIE, C. J.   This is a false imprisonment action. On April 23, 1971, plaintiff-appellant Ethel M. Dupler was fired from her job with the defendant-respondent Wisconsin Telephone Company. She was informed of her discharge during an hour-and-a-half session with her two superiors, defendants-respondents Keith Peterson and Helen Seubert, who, Dupler claims, falsely imprisoned her during a portion of this time period. A jury found that Peterson and Seubert did falsely imprison Dupler and fixed damages at $7,500. The trial court gave Dupler the option of accepting a lower amount —$500—or a new trial on the issue of damages. The option was not exercised, judgment for $500 was entered, and Mrs. Dupler appeals. We reverse and remand for a new trial on the issue of damages, but give plaintiff-appellant an option to accept $1,000 damages in lieu of a new trial.

Dupler had worked for the telephone company as a customer service representative since 1960. At approximately 4:30 on April 23rd, Seubert asked Dupler to come to Peterson's office. When all three were inside, sitting down, with the door closed, Seubert told Dupler the telephone company would no longer employ her and that she could choose either to resign or be fired. Dupler testified that she refused to resign and that in the con-

versation that followed, Peterson discussed several alternatives short of dismissal, all of which had been considered but rejected.

At approximately 5 o'clock, Dupler testified, she began to feel sick to her stomach and said "You have already fired me. Why don't you just let me go." She made a motion to get up but Peterson told her to sit down in "a very loud harsh voice." Then, Dupler testified, she began to feel violently ill and stated " 'I got to go. I can't take this any more. I'm sick to my stomach. I know I'm going to throw up.' " She got up and started for the door but Seubert also arose and stood in front of the door. After Dupler repeated that she was sick, Seubert allowed her to exit, but followed her to the men's washroom, where Dupler did throw up. Following this, at approximately 5:25, Seubert asked Dupler to return to Peterson's office where she had left her purse to discuss the situation further. Dupler testified that she went back to the office and reached for her purse; Seubert again closed the door and Peterson said "[i]n a loud voice 'Sit down. I'm still your boss. I'm not through with you.' " At approximately 5:40 Dupler told Peterson her husband was waiting for her outside in a car and Peterson told her to go outside and ask her husband to come inside. Dupler then went ouside and explained the situation to her husband who said " 'You get back in there and get your coat and if you aren't right out I'll call the police.' " Dupler returned to Peterson's office and was again told in a loud tone of voice to sit down. She said Seubert and Peterson were trying to convince her to resign rather than be fired and again reviewed the alternatives that had been considered. Dupler then said: " 'What's the sense of all this. Why keep torturing me. Let me go. Let me go.' " She stated that Peterson replied " 'No, we still aren't finished. We have a lot of things to discuss, your retirement pay, your vacation,

other things.' " Finally, at approximately 6 o'clock Peterson told Dupler they could talk further on the phone or at her house, and Dupler left. When asked why she had stayed in Peterson's office for such a long time, Dupler replied:

"Well, for one thing, Helen, Mrs. Seubert, had blocked the door, and tempers had been raised with all the shouting and screaming, I was just plain scared to make an effort. There were two against one."

Peterson and Seubert did not dispute that Dupler had been fired on April 23rd, or that the conference lasted from 4:30 to 6 p.m., or that Dupler became very upset and sick to her stomach and had to leave to throw up. Peterson admitted that Dupler had asked to leave and that he requested that she stay and continue talking so she could indicate whether she wished to resign or be fired. Seubert said Dupler did not so indicate until "within three minutes of her leaving." Both denied that any loud or threatening language had been used, or that Dupler was detained against her will. Peterson said neither he nor Seubert even raised their voices. He said the session was so lengthy because Dupler continued to plead for another chance, and to request reasons for the dismissal.

The jury found that both Peterson and Seubert falsely imprisoned Dupler and fixed her damages at $7,500. At the same time, the jury found that Dupler's coplaintiff husband was not entitled to any damages. It found that Peterson and Seubert had not acted maliciously and thus did not award any punitive damages.

The first question raised as to the trial court's order on motions after verdict as submitted by defendants is as follows:

*Should the trial court have denied defendants' post-verdict motions because the grounds for the motions were not sufficiently specific?*

Defendants filed alternative motions after verdict asking for change of answers in the jury's special verdict, judgment notwithstanding the verdict, and for a new trial. As grounds for these motions, defendants asserted in part, concerning the jury's damage award, that there was no credible evidence in the record to permit a jury to find any damages, that the award was based upon the answer of a doctor-witness to an improper hypothetical question, and that jury was influenced by improper remarks and conduct of plaintiffs' counsel. Plaintiffs argue that the motions should have been denied by the trial court because defendants failed to sufficiently specify the grounds for claiming insufficient evidence. We disagree.

Plaintiffs rely on *State v. Escobedo,*[1] in which the court held that to secure appellate review of a claim of insufficient evidence a party must make "a motion either for a new trial or to set aside a verdict based on a statement of the particular grounds upon which the contention of insufficient evidence is made." In *Escobedo,* where defense counsel orally moved for judgment notwithstanding the verdict without stating the basis for the motion and the trial court denied the motion without opinion, the court held the sufficiency-of-evidence question could not be raised as of right on appeal.

The facts in the instant case are different in three significant respects: (1) Here, defendants not only asked for a judgment notwithstanding the verdict, but also requested a new trial or that the jury's answers be changed. (2) Defendants did particularize, at least to some degree, their grounds for arguing insufficiency of the evidence, by specifying particular findings they felt were unsupported. (3) Finally, and most importantly, the motions as filed were obviously sufficient to alert the

---

[1] (1969), 44 Wis. 2d 85, 95, 170 N. W. 2d 709. *Accord: Whitmore v. State* (1973), 56 Wis. 2d 706, 717, 203 N. W. 2d 56; and *State v. Schneidewind* (1970), 47 Wis. 2d 110, 176 N. W. 2d 303.

trial court to the specific grounds asserted, since the trial court ruled, in part, in defendants' favor after a thorough discussion of the evidence. The rule expressed in *Escobedo* was primarily designed to insure a full-bodied record in the trial court on all matters argued on appeal and also to allow the trial court itself to correct any errors in the trial, thus possibly avoiding the need for appeal in the first place. Both these interests were fully served here, and plaintiffs have not alleged they were in any way prejudiced by the form of defendants' motions, as, for example, by being unable to prepare to argue against them. To the contrary, it appears both sides filed extensive briefs in the lower court.

We conclude, therefore, that the trial court was correct in ruling on the merits of defendants' postverdict motions rather than dismissing them for failure to particularize the grounds of the alleged errors.

The second question raised by the trial court's order on defendants' motions after verdict is:

*Was the trial court precluded from reducing Dupler's damages because it acted more than two months after the jury returned its verdict?*

While the jury returned its special verdict on April 10, 1973, plaintiffs moved for judgment on the verdict on April 17th, and defendants made postverdict motions on May 27th, the trial court did not render its decision on these motions until October 19, 1973. Thus it is clear that the trial court lacked authority to enter its decision and order on the jury verdict, because it had not acted within the two-month time limit set forth in sec. 270.49 (1), Stats. This section provides, in part:

"A party may move to set aside a verdict and for a new trial because of errors in the trial or because the verdict is contrary to law or to the evidence, or for excessive or inadequate damages or in the interest of justice; but such motion must be made and heard within 2 months after the verdict is rendered, unless the court

by order made before its expiration extends such time for cause. Such motion, if not decided within the time allowed therefor, shall be deemed overruled. . . ."

Under this section it is required that both the motion for a new trial and the court's decision on the motion must take place within the two-month period.[2] The record here contains no order extending the time limit for cause, and it is therefore clear that sec. 270.49 (1) was not complied with.

Defendants argue that plaintiffs waived any right to rely on this statute. We think not. All motions after verdict were filed before June 10, 1973, the date that is sixty days after the jury returned its verdict, and both defendants and plaintiffs had filed briefs before that date as well. After oral argument on June 7, 1973, the trial court said that it would give both parties the opportunity to file further briefs if they wished. The trial court stated: "Any response to any brief should be in by the end of June." Subsequently, defendants did file a brief on June 28th, and plaintiffs filed both a brief on July 9th, and a further letter in September containing a citation to a recent decision.

These facts do not establish waiver. In *Lingelbach v. Carriveau*[3] the court considered facts virtually identical to those of the instant case. Prior to the expiration of the sixty-day period both parties had filed postverdict motions, but had not filed briefs. Just before the end of the period, defendant requested a chance to file briefs, which was allowed, but no formal order was entered extending the time for decision. After the sixty days had run the trial court granted plaintiff's motion for a new trial and defendant appealed, arguing the trial court lacked authority to overturn the jury verdict due to delay.

---

[2] *Lingelbach v. Carriveau* (1933), 211 Wis. 653, 248 N. W. 117, 248 N. W. 922.

[3] *Id.*

The supreme court agreed and reversed the trial court's new trial order. The court recognized that waiver of rights under the statute could occur where a party expressly requested a judge to delay the time for decision and the judge complied. However, in the absence of an express request to delay the decision, granted by the trial court, there can be no implied waiver based on the parties' conduct.[4]

The crucial point is that sec. 270.49 (1), Stats., requires the trial court to enter its order on motions after verdict within sixty days after the verdict or else enter an order within that time which extends the time for formal decision for cause. Since there was here no waiver of plaintiffs' rights under sec. 270.49 (1), the trial court lacked authority to enter its order on the postverdict motions made by the defendants.

On the other hand, as stated numerous times, where an order is declared void for failure to comply with sec. 270.49 (1), Stats., this court may independently review the record and order a new trial, if warranted, in the interest of justice.[5]

The issue raised by a motion for review filed by defendants-respondents is:

*Is the jury's verdict, finding that Dupler was falsely imprisoned, supported by the evidence?*

The essence of false imprisonment is the intentional, unlawful, and unconsented restraint by one person of the physical liberty of another.[6] In *Maniaci v. Marquette University*,[7] the court adopted the definition of false imprisonment contained in sec. 35 of the Restatement of *Torts* 2d, which provides in part:

[4] *Id.* at pages 657, 658. *See also: Bankers Finance Corp. v. Christensen* (1923), 181 Wis. 398, 195 N. W. 319; *Beck v. Wallmow* (1938), 226 Wis. 652, 277 N. W. 705.

[5] Sec. 251.09, Stats.; *Toulon v. Nagle* (1975), 67 Wis. 2d 233, 241, 242, 226 N. W. 2d 480.

[6] *Strong v. Milwaukee* (1968), 38 Wis. 2d 564, 157 N. W. 2d 619.

[7] (1971), 50 Wis. 2d 287, 184 N. W. 2d 168.

**"False Imprisonment**

"(1) An actor is subject to liability to another for false imprisonment if

"(a) he acts intending to confine the other or a third person within boundaries fixed by the actor, and

"(b) his act directly or indirectly results in such a confinement of the other, and

"(c) the other is conscious of the confinement or is harmed by it."[8]

Secs. 39[9] and 40[10] provide that the confinement may be caused by physical force or the threat of physical force, and the comment to sec. 40 indicates the threat may either be express, or inferred from the person's conduct. As Prosser comments:

*"Character of Defendant's Act*

"The restraint may be by means of physical barriers, or by threats of force which intimidate the plaintiff into compliance with orders. It is sufficient that he submits to an apprehension of force reasonably to be understood from the conduct of the defendant, although no force is used or even expressly threatened. . . . This gives rise, in borderline cases, to questions of fact, turning upon the details of the testimony, as to what was reasonably to be understood and implied from the defendant's conduct, tone of voice and the like, which seldom can be reflected accurately in an appellate record, and normally are for the jury."[11]

This is precisely such a case and we conclude that the record contains sufficient evidence from which the jury

---

[8] Restatement, 1 *Torts* 2d, p. 52, sec. 35.

[9] *Id.* at page 59: "39. **Confinement by Physical Force**

"The confinement may be by overpowering physical force, or by submission to physical force."

[10] *Id.* "40. **Confinement by Threats of Physical Force**

"The confinement may be by submission to a threat to apply physical force to the other's person immediately upon the other's going or attempting to go beyond the area in which the actor intends to confine him."

[11] Prosser, *Torts* (4th ed. 1971), p. 44, sec. 11.

could have concluded that Mrs. Dupler was intentionally confined, against her will, by an implied threat of actual physical restraint. She testified that defendant Peterson ordered her in a loud voice to remain seated several times, after she expressed the desire to leave. She reported being "berated, screamed and hollered at," and said the reason she did not just walk out of the room was that "Mrs. Seubert had blocked the door, and tempers had been raised with all the shouting and screaming, I was just plain scared to make an effort. There were two against one." The jury obviously believed Mrs. Dupler's rather than the defendants' account of what transpired, as it had the right to do, and we conclude her testimony was sufficient to support the jury's verdict.

Defendants rely upon the 1926 case of *Weiler v. Herzfeld-Phillipson Co.*,[12] where this court held that an employer, who had detained an employee in his office for several hours upon suspicion of theft and then discharged her, was not liable for false imprisonment. This case is distinguishable, however, principally upon the ground that in *Weiler* the court emphasized several times that during the entire session the plaintiff was still employed by defendant and "was compensated for every minute of the time spent by her in the office."[13] In the instant case, Dupler was compensated only through 5 p.m., and according to her testimony, she was not ordered to remain in the office, after she requested to leave, until after 5 p.m.

We conclude that *Weiler* is not controlling here and that the jury could properly find that defendants falsely imprisoned Dupler by compelling her to remain in Peterson's office against her will after 5 p.m. We conclude the imprisonment ceased when Dupler left the building to

[12] (1926), 189 Wis. 554, 208 N. W. 599.
[13] *Id.* at page 557.

visit her husband, but resumed when she re-entered Peterson's office to get her coat in order to leave, but was commanded to stay.

We thus reach the determinative issue on this appeal: *Is the jury's damages verdict supported by the evidence?*

The trial court was entirely correct in determining that Dupler's award of $7,500 was not supported by evidence.

Dupler, fifty-seven years old at the time of trial, testified that she suffered severe nausea and headaches while she was confined in Peterson's office. Following the incident and continuing through the time of trial, she said she became a "nervous wreck" and that she never had "nervous trouble" previously. She testified she could not sleep well and often had nightmares about the incident. Her appetite suffered and she lost considerable weight. She said she was too nervous to participate in normal family activities and her husband testified that following the incident their sexual relationship had ceased. He also reported that his wife had suffered severe emotional trauma as a result of the incident and often awakened in the middle of the night screaming. He said she had never experienced similar problems in the past. Dupler testified she was hospitalized from May 1st to May 7th also as a result of the emotional impact of the incident.

No treating physician testified at the trial. Rather, Dr. Edward Houfek answered a lengthy hypothetical question describing the incident and the symptoms reported by Dupler. The doctor stated that, assuming the symptoms were being reported accurately, it was his opinion to a reasonable degree of medical probability that "the likelihood of the symptoms continuing is present."

In our view, the jury's $7,500 damage award is unsupported by the evidence in two respects: (a) No attempt

was made at trial to distinguish between the noncompensable emotional harm caused by the firing and the compensable harm resulting from the false imprisonment; and (b) no evidence was presented that would support the damages figure itself.

(a) *Cause.* Plaintiffs' suit rests entirely upon the false imprisonment, and no claim has been made that the actual firing itself was tortious or otherwise illegal. Where a plaintiff is injured due not only to false imprisonment but also due to another noncompensable cause, only those damages found to be a "natural result" of the false imprisonment are recoverable.[14]

Although the jury here could reasonably conclude that some emotional injury resulted from the false imprisonment since Dupler felt violently ill upon being told she could not leave, Dupler also testified that she began to feel sick to her stomach just prior to this particular point, but subsequent to the time she was told she would be fired. No attempt was made to separate the harm resulting from these two causes, and in at least three places in the record any distinction was hopelessly blurred: (1) Dupler was asked on cross-examination whether the mental anguish she suffered had been caused by her discharge. She replied, "It was. In the manner in which it was handled." (2) Dr. Houfek said that a "significant portion" of his answer to the hypothetical question concerning the likelihood of future emotional suffering depended upon the fact that the hypothetical person had lost his or her job. Later in his testimony, however, he said the fact of job loss was not the "most significant" factor. Neither statement was further elaborated upon. (3) Finally, the one (and only) hospital record submitted into evidence consisted of the following two sentences written by a treating physician:

[14] *Hadler v. Rhyner* (1944), 244 Wis. 448, 12 N. W. 2d 693. *See: Johnson v. Heintz* (1973), 61 Wis. 2d 585, 603, 213 N. W. 2d 85.

"This patient who has been working at the telephone company for many years finds herself suddenly relieved of her duties and this has greatly saddened her. I am certain she is suffering from a situational depressive reaction, however, further hospitalization for treatment seems indicated."

Based upon the meager state of the record concerning the cause of the harm to Dupler we conclude that the jury award cannot stand. While apportionment of injury in a case like this is not easy, here there was not even any attempt. Moreover, Dupler's treating physician, who would undoubtedly be the person most able to shed light on this problem, was not even called as a witness.

(b) *Amount of damages.* The evidence concerning the amount of damages is even more meager. Although Dupler reported a six-day period of hospitalization, other consultations with her doctor, and the use of tranquilizers, no hospital or doctor bills were submitted in evidence. The record is completely devoid of any information concerning the nature of any medical treatment or psychotherapy that Dupler may have undergone while in or out of the hospital. No evidence was presented concerning Dupler's present or future need for psychiatric care. The only medical testimony presented at trial came from Dr. Houfek who had never even met her. While a plaintiff need not prove damages with mathematical certainty, particularly where mental suffering is involved,[15] the jury cannot be left to speculation and conjecture concerning the measure of damages.[16]

In view of the meager state of the record on the damages issue, we conclude that it would be a miscarriage of justice to uphold the jury verdict awarding Dupler $7,500

[15] *Redepenning v. Dore* (1972), 56 Wis. 2d 129, 142, 143, 201 N. W. 2d 580.

[16] *Hajec v. Novitzke* (1970), 46 Wis. 2d 402, 418, 175 N. W. 2d 193.

damages. The case should be remanded for a new trial. We also conclude that a reasonable amount for a damage recovery by Dupler is $1,000, and we therefore give plaintiffs a *Powers*[17] rule option to accept $1,000 in damages in lieu of the new trial.

*By the Court.*—Order affirmed; judgment modified with new trial ordered on the issue of damages unless, within twenty days of remittitur, plaintiff-appellant Ethel Dupler elects to accept judgment for $1,000, and, as modified, affirmed.

---

[17] *Powers v. Allstate Ins. Co.* (1960), 10 Wis. 2d 78, 102 N. W. 2d 393.