The GENERAL TELEPHONE COMPANY OF WISCONSIN,† Plaintiff-Appellant,

v.

AUTO-OWNERS INSURANCE COMPANY and Harold Mohr, Defendants-Respondents.

Court of Appeals

*No. 86–0158. Orally argued January 20, 1987.—Decided May 5, 1987.*

(Also reported in 409 N.W.2d 133.)

† Petition to review denied.

11

For the plaintiff-appellant, there were briefs and oral argument by *Thomas Terwilliger* of *Terwilliger, Wakeen, Piehler & Conway, S.C.* of Wausau.

For the defendants-respondents, there was a brief submitted by *George A. Richards* and *Barbara A. Hermanson* and oral argument by *George A. Richards*

of *Tinkham, Smith, Bliss, Patterson, Richards & Hessert* of Wausau.

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J.   General Telephone Company of Wisconsin (GTE) appeals a nonfinal order granting a new trial and denying its motions for judgment on the verdict and for liquidated damages. GTE claims that the trial court had no authority to rule on Mohr's untimely new trial motion; that the trial court rendered its decision on the new trial motion in an untimely fashion; and that the trial court abused its discretion in ordering a new trial and by denying GTE's motions for judgment on the verdict and for liquidated damages. Because we conclude that the trial court had no authority to order a new trial, we reverse that order. However, because it appears from the record that the issues were not fully tried, we independently remand for a new trial under sec. 752.35, Stats.

In 1977, Mohr conceived an idea for selling telephone advertising messages. According to Mohr's plan, a "Time and Temperature Announcement Service" (T&T) number would be listed in the local phone directory. Persons calling the number would receive a short, recorded advertising message followed by the correct time and temperature. Mohr's idea was unusual in that it changed messages hourly in order to serve many clients. Most similar services apparently only carried a single sponsor.

In late 1979, Mohr contracted with GTE, who would provide the necessary equipment and connections for Mohr to offer the T&T service in the Minocqua area. In early 1980, he entered into a similar contract to provide the service in the Eagle

River area. Later, GTE assigned phone numbers for the T&T service. Mohr contends that after the contracts were signed, he and a GTE representative had a phone conversation where Mohr requested that his private business number also appear in both the Minocqua and Eagle River yellow pages, indented beneath the T&T number. GTE, Mohr claims, agreed to such listings in the Minocqua and Eagle River yellow pages.

Later, GTE published its directories for the Minocqua and Eagle River areas. The white pages in each directory listed the T&T number with Mohr's private business number indented below. In the Minocqua yellow pages, however, Mohr's name and private business number appeared alone under the heading, "Time and Temperature Service." The listing did not include the T&T number. No listing appeared in the Eagle River yellow pages.

Because the Minocqua yellow pages listed only Mohr's private number under the T&T heading, Mohr personally received many calls, at all hours, requesting the correct time and temperature. Mohr and GTE met in an effort to solve this problem, but the two parties came to no agreement. Mohr's advertising customers subsequently began to cancel their subscriptions to the service, and Mohr stopped making payments under his contracts with GTE.

GTE filed suit against Mohr and Auto-Owners[1] for $55,445.70, the amount specified in the contracts' liquidated damage clauses. Mohr counterclaimed, alleging breach of contract and negligence, and claiming damages of $425,000. Specifically, Mohr counter-

---

[1]Auto-Owners is a party because it provided a performance bond on Mohr's behalf.

claimed that GTE breached a verbal agreement to provide yellow page listings in both Minocqua and Eagle River that included the T&T number as well as Mohr's private business number. In addition to the alleged breach, Mohr argued that GTE acted negligently by failing to exercise due care in helping him plan and implement the T&T service. GTE argues that Mohr received precisely the listings specified in the written contracts, contends that no extrinsic agreement existed, and denies the negligence claim.

The ensuing trial lasted nearly two weeks. On June 14, 1985, after deliberating for about three hours, the jury returned its answers to the special verdict questions placed before it. The jury found, among other things, that Mohr, and not GTE, had breached the contracts. However, the jury also found that Mohr's breach had caused GTE "zero" damages.

On July 3, 1985, GTE filed timely motions after verdict urging the trial court to set aside the verdict, dismiss Mohr's counterclaim, and enter judgment for liquidated damages. Twenty-seven days after the jury's verdict, on July 11, Mohr filed motions asking the court to set aside the verdict, to find that GTE had breached its contracts and, in the alternative, to grant a new trial. GTE then moved to strike Mohr's motions after verdict, claiming they were untimely under the twenty-day limit of sec. 805.16, Stats.

The trial court heard arguments in August on the motions after verdict and took under advisement GTE's motion to strike Mohr's untimely motions. In addition, the trial court granted an enlargement of the ninety-day period for the court to render a decision on the motions after verdict.[2] The hearing

---

[2]Section 805.16, Stats., provides in part:

transcript and the clerk's minutes reveal that the trial court stated it would render its decision by October 4, 1985, a date beyond the ninety days specified in sec. 805.16.

Mohr asserted as a ground for a new trial that he discovered a GTE tariff that purportedly entitled him to the yellow page listings he never received. His discovery preceded his petition to the Wisconsin Public Service Commission (PSC) for an opinion on the tariff's applicability to his contracts with GTE. The PSC issued a staff opinion stating that the tariff entitled Mohr to yellow page listings he had not received under his contracts with GTE. The PSC later vacated its staff opinion when it learned of the pending litigation.

The trial court entered its decision on the motions after verdict on November 26, 1985, fifty-three days after the court's self-imposed October 4 deadline and seventy-two days beyond the ninety-day limit contemplated by sec. 805.16. In its decision, the court denied GTE's motions to strike Mohr's motions after verdict and ordered a new trial.

GTE moved to vacate the trial court's order because it had been rendered after the October 4 extended deadline. After a hearing, the trial court denied GTE's motion, claiming that it believed the deadline was December 4. The trial court added that regardless of whether Mohr's original motions after verdict were timely, it "would have" granted a new trial on its own motion.

If an order granting or denying a motion challenging the sufficiency of evidence or for a new trial is not entered within 90 days after verdict, the motion shall be deemed denied.

16

Initially, we consider the timeliness of Mohr's motions after verdict. Mohr first argues that his failure to file the motions within the twenty-day limit stemmed from excusable neglect. Section 805.16 provides that "[m]otions after verdict shall be filed and served within 20 days after the verdict is rendered." Although sec. 801.15(2)(a), Stats., provides generally for enlargement of procedural time periods upon a showing of excusable neglect, sec. 801.15(2)(c), Stats., provides that "[t]he time ... for motions after verdict under s. 805.16 ... may not be enlarged." Thus, the general rule allowing enlargement of procedural periods is negated with respect to motions after verdict by the specific language of sec. 801.15(2)(c). *Brookhouse v. State Farm Mut. Auto. Ins. Co.,* 130 Wis. 2d 166, 169–70, 387 N.W.2d 82, 84 (Ct. App. 1986).

Mohr also argues that despite his motions being filed after the twenty-day deadline, they were properly before the court because GTE's timely motion "raised all the issues and obvious problems with the jury's verdict." We disagree. Although it is true that both parties challenged the jury's verdict, it is also true that the parties challenged distinct aspects of that verdict for differing reasons. One party's timely motion after verdict may not imbue a court with authority to rule on another party's untimely motion.

Mohr also argues that the trial court had the inherent power to grant a new trial in the interest of justice. We conclude that a trial court's sua sponte new trial motion is subject to the statutory time limits governing the parties' motions.

The trial court's inherent power to grant a new trial in the interest of justice on its own motion is well established. *Estate of Noe,* 241 Wis. 173, 177, 5 N.W.2d 726, 728 (1942). However, this power is not limitless. It is true that a trial court may grant a new trial at any time when an order or judgment was obtained by fraud or a similar violation of equity. *Estate of Baumgarten,* 12 Wis. 2d 212, 222–23, 107 N.W.2d 169, 175 (1961). However, where there is no equitable ground, such as fraud, for setting aside an order or judgment, the trial court's exercise of power is subject to statutory time limits. *See id.* at 223, 107 N.W.2d at 175. Where, as here, the trial court orders a new trial because the real issues have not been fully tried, its decision is subject to the time limits imposed by statute.

█

This conclusion makes it immaterial whether the court actually relied on its inherent power or on Mohr's untimely motion in ordering the new trial. In either case, the trial court erred by failing to decide the motion by the specified date of October 4, 1985.[3] Because the certified transcript as well as the clerk's minutes indicate the deadline for rendering a decision was October 4, we conclude that the trial court had lost its authority to rule on the motions when it made its November 26 decision.[4] Anticipating this result,

---

[3]Although beyond the ninety-day limit, we consider the October 4 date as equivalent to statutory time limits because the statutes allow a trial court to enlarge the time needed for rendering a decision, "for cause shown and upon just terms." Section 801.15(2)(a), Stats.

[4]Wisconsin law affords a properly certified transcript a presumption of reliability by declaring it admissible as evidence. Section 889.11, Stats.

18

Mohr argues that GTE's filing of documents after October 4 amounted to waiver of the specified deadline. However, Wisconsin law is clear that such conduct does not constitute an implied waiver of the right to have a motion decided on time. *Dupler v. Seubert,* 69 Wis. 2d 373, 380–81, 230 N.W.2d 626, 630–31 (1975).

We therefore conclude that the trial court had no authority to consider Mohr's motions after verdict. Moreover, after failing to render a timely decision, the trial court lost its authority to order a new trial on its own motion in the interest of justice.

■

The court of appeals may independently grant a new trial where it appears from the record that it is probable that justice has miscarried or that the real controversy has not been fully tried.[5] Because we conclude that issues involving tariffs required to be filed with the PSC were not properly resolved at trial, we invoke our discretionary power to order a new trial.

■

The trial court's failure to resolve the tariff issue provides grounds for a new trial. GTE is a telecommu-

---

[5]Section 752.35, Stats., provides:

**Discretionary reversal.** In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record and may direct the entry of the proper judgment or remit the case to the trial court for entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

nications utility subject to regulation under ch. 196, Stats. Section 196.01(10), Stats. It is required to file with the PSC schedules showing all rates, tolls, and charges for its services. Section 196.19(1), Stats. In addition, GTE must file with the PSC, as a part of the required rate schedules, all rules and regulations that in any manner affect its services, products, or rates. Section 196.19(2), Stats. The rate schedules, as well as the rules and regulations filed with them, are collectively referred to as tariffs. *See IT&T Corp. v. United Tele. Co.*, 433 F. Supp. 352, 357 n. 4 (M.D. Fla. 1975), *aff'd*, 550 F.2d 287 (5th Cir. 1977).[6]

Unless challenged or changed through the administrative procedures prescribed by ch. 196, the filed tariff governs the conduct of the utility and its customers; it cannot be changed by contract. *See Chicago & N.W. R.R.*, 71 Wis. 2d 143, 148, 238 N.W.2d 69, 72 (1976). A tariff insures that all utility customers are treated equally by requiring all tariffs to be readily available for public inspection. *See id.;* sec. 196.19(3), Stats.

Mohr argues that a GTE tariff requires a complimentary yellow page listing for all business numbers and that his T&T service number was a business number. GTE first argues that Mohr waived his tariff argument by failing to raise the issue at trial and, if not, that the tariff on its face does not cover "special services" such as Mohr's T&T service.

---

[6]Chapter 196 uses, but does not define, the word "tariff." However, judging from the context surrounding its use, we see no reason to doubt that the legislature intended "tariff" to mean rate schedules and accompanying rules and regulations that are filed with the PSC.

First, we note that GTE itself introduced the contested tariff. We therefore need not decide whether a party may waive a tariff issue at trial. The issue was raised. The tariff reads in part:

> In addition, one directory listing will be provided without charge in the classified section [yellow pages] of the same directory for each service indicated above which is classified as [a] business service.[7]

Further, GTE presented the following testimony from one of its employees:

> Under our tariffs it is stated that if a customer pays for a business line, he is then entitled to a complimentary yellow page listing. This [Mohr's T&T service] was a special rate, if you will, a special type of equipment, and it did not have a billing for a line. There was no physical line that the customer was billed for.

GTE contends that the tariff is not applicable to Mohr's T&T service. GTE bases its argument on its distinction between a "special service" and a "business service," claiming that the T&T apparatus had no physical "business line." Without a "business line," GTE argues, the tariff requiring complimentary yellow page listings does not apply. Although it is true that the parties are both bound by the applicable tariff, there is no basis in the record for determining the validity of GTE's "business service/special ser-

---

[7]Introduced as plaintiff's Exhibit No. 89, the tariff is denominated as "P.S.C. of W. No. 1, section 8, eighth revised sheet 8.1, amendment no. 714, effective: February 1, 1979." It is entitled, "Directory Listings," and the applicable paragraphs are numbered 1.4 and 1.4.1.

vice" distinction. If the tariff is interpreted to require a complimentary listing for the T&T service, then GTE, as a matter of law, has violated the tariff regardless of its contracts with Mohr. Because the trial court never resolved the question of the tariff's applicability to Mohr's T&T service, the contract theory of the case was not fully tried.

Whether Mohr's T&T service constitutes a business entitled to complimentary yellow page listings raises factual and policy questions that are peculiarly within the ambit of the PSC. Defining terms that are unique to the telecommunications industry is outside conventional judicial knowledge. More important, a PSC interpretation would further the legislative purpose behind the creation of an administrative agency: to afford a systematic method of factfinding and policymaking. *See McEwen v. Pierce County,* 90 Wis. 2d 256, 272, 279 N.W.2d 469, 476 (1979). The PSC's interpretation of this tariff is more likely than an isolated court decision to reflect the general policy guideposts established by decades of administrative decisions. Accordingly, we conclude that this case is an appropriate instance to defer to the primary jurisdiction of the PSC.

The doctrine of primary jurisdiction is applied when a court's processing of a claim depends on the resolution of issues that, under a regulatory scheme, have been placed within the special competence of an administrative body. *Wisconsin Collectors Ass'n Inc. v. Thorp Finance Corp.,* 32 Wis. 2d 36, 47, 145 N.W.2d 33, 38 (1966). The doctrine does not deprive a court of jurisdiction to decide a matter, but serves to promote comity in relationships between the courts and administrative agencies. *Id.* at 44, 145 N.W.2d at 36–37. The

doctrine is particularly applicable when the issue presented to the court involves exclusively factual questions within the peculiar expertise of the agency. *Id.* at 45, 145 N.W.2d at 37. In exercising its discretion, the trial court should understand that the legislature has created the agency in order to afford a systematic method of policymaking as well as factfinding; and that the agency's jurisdiction should be given priority in the absence of a valid reason for judicial intervention. *Id.*

Where primary jurisdiction is an issue, a court can, in its discretion, either hear a case or defer to the expertise of an administrative agency. *Browne v. Milwaukee Bd.*, 83 Wis. 2d 316, 328, 265 N.W.2d 559, 564, *reh'g denied,* 267 N.W.2d 379 (1978). Accordingly, the question of primary jurisdiction is not one of subject matter jurisdiction but, rather, one of which portion of the dispute-settling apparatus—the courts or the agency—should, in the interests of judicial administration, first take the jurisdiction that both the agency and the courts share. *Id.*

Here, the question of the tariff's applicability is a matter peculiarly suited to PSC resolution. Accordingly, along with exercising our discretion to order a new trial, we order that the parties first resolve the question of the tariff's applicability by pursuing the administrative remedies prescribed in ch. 196.

*By the Court.*—Order reversed and cause remanded for a new trial on all issues following administrative resolution of the tariff question.