Cecilia REDICAN and Tamra Wright,
Plaintiffs-Respondents,

v.

K MART CORPORATION,
Defendant-Appellant.

No. WD 38752.

Missouri Court of Appeals,
Western District.

June 23, 1987.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 4, 1987.

Application to Transfer Denied
Sept. 15, 1987.

Michael Hufft, John R. Fox, Merrick, Baker, Fox & Hufft, Kansas City, for defendant-appellant.

Edward J. Houlehan, Houlehan and Waterman, Kansas City, for plaintiffs-respondents.

Before KENNEDY, P.J., and TURNAGE and MANFORD, JJ.

TURNAGE, Judge.

Cecilia Redican and Tamra Wright each filed suit against K Mart for false imprisonment and malicious prosecution. The cases were consolidated for trial. Judgment was entered on the jury verdicts awarding each plaintiff $15,000 actual damages and $35,000 punitive damages for false imprisonment and $1,000 actual damages for malicious prosecution.

The court denied K Mart's motion for directed verdict or in the alternative for a new trial, but sustained Redican's and Wright's motions for a new trial of the malicious prosecution claim on the issue of damages only.

K Mart appeals, contending that the evidence was insufficient to support a verdict for false imprisonment; that K Mart had reasonable grounds as a matter of law to believe that Redican and Wright had stolen cigarettes; that the evidence was insufficient to show actual malice; and that the suits were barred by the Worker's Compensation law. Affirmed in part and reversed and remanded in part.

Redican and Wright were employed at the K Mart store on Eastwood Trafficway in Kansas City on March 30, 1984. Wright had been employed by K Mart for about three years. Although Redican had worked for K Mart about four years, she had only been a cashier about two weeks prior to the incident in question.

On March 30, while on duty, Wright determined that cigarettes had been placed on a "blue light" special. She wanted to buy cigarettes and a bag of diapers. She walked to the front of the store and picked up five cartons of cigarettes near register 10. Then she walked across the store to the infant's department, where she picked up a bag of diapers. She returned to the register area and placed the cigarettes and diapers behind register 2, because all the operating registers had long lines of customers. At the time Wright put the cigarettes and diapers behind register 2, she told Linda Phillips, the head cashier, that the merchandise was hers and that she was going to pay for it when the lines went down. Phillips told Wright that was acceptable. Wright also told Redican, who was operating register 10, that Wright had merchandise behind register 2. Wright then went to the service desk, which was next to the register, and talked with an area supervisor.

When Wright saw the line at Redican's register clear, she went to register 2, picked up her merchandise, and took it to Redican's counter. Redican testified that she was having the first busy night she had had since she began working as a cashier. Wright stated that Wright placed

all of the cigarettes and diapers on Redican's counter and called for a pink slip, which was required by K Mart rules for all employee purchases, as a way of overseeing such transactions. Linda Phillips, who was the K Mart employee responsible for giving the pink slip and overseeing the sale, told Wright that she would be down in a minute and to go ahead with the purchase. As Redican began ringing up Wright's purchase, Phillips arrived to supervise. Phillips stood behind Redican to observe her ringing up the merchandise. Wright said she did not begin putting any of her merchandise in sacks until Phillips arrived. Phillips saw all of the items being sacked. Phillips filled out the pink slip, which listed Wright's employee number and the register number. The pink slip was then validated by the cash register. Wright paid the amount indicated by the cash register. Wright stapled her pink slip to the sack containing the cigarettes and her cash register receipt to the bag of diapers.

Later, while Wright was on her break, another K Mart employee, J.R. Van Meter, told her to go up to the personnel office to see Kenneth Ostertag, the assistant manager. Wright went to the office and waited about ten minutes, until a cashier arrived to sit with her. This cashier apparently had been told by Ostertag to see that Wright stayed in the personnel office. About thirty or forty-five minutes later, Ostertag took Wright to the security office. Glen Conners, the loss prevention manager of K Mart, and Ray Matlock, an off-duty Kansas City policeman who was employed by K Mart, were in the office. Conners asked Wright if she could identify the cigarette cartons and diapers, which were on the desk, and Wright said they were hers. Conners asked if she could verify that the merchandise was hers by the sales receipt. Wright looked at the receipt and immediately said that there was a mistake, because two of the packages of cigarettes were not rung up. Wright testified that this moment was the first she knew that two cartons of cigarettes had not been rung up. She offered to pay the $15, but Conners refused her offer. She stated that she tried to explain that it was a mistake, but that Conners was abusive, loud, and aggressive; called her a liar and thief; and used a vulgar epithet. Conners told Wright that he wanted to hear the truth and not that the omission had been a mistake.

Ostertag also told Redican he wanted to see her. He took her back to the security office. Redican waited alone until Ostertag, Conners and a police officer came in. Conners opened a sack, put the cigarettes on the desk, and asked Redican if she could "explain this," as he thumped two cigarette cartons. Redican recognized the merchandise as the Wright sale. She looked at the receipt and the cartons and said that she had made a mistake by not ringing up two cartons. Conners told her nobody made mistakes like that and that she was lying.

Redican offered to pay for the two cartons, but Conners accused her of deliberate underringing. Redican testified that Conners was very aggressive and belligerent and kept telling her she was lying. Redican testified that she did not believe that she could leave the room.

Redican was taken to the personnel office. Redican saw Wright when Redican entered the room. After a period of time Redican was taken back to the security office. There, Conners told her that she was fired and that she would never work for K Mart again. Conners had already told Wright that she was fired and would never work for K Mart again. Conners told both Wright and Redican to tell what happened or he would have to "get rough" and have them taken downtown. Wright and Redican continued to insist that the underringing was only a mistake.

The police department was called, and a paddywagon was requested to come to the K Mart store. The police officer driving the paddywagon escorted Wright and Redican through the store. Even though the store had closed, there were employees still present who saw Wright and Redican being escorted by the police officer.

Wright and Redican were placed in the back of the paddywagon. They were taken

to the police station and finger-printed. They posted bonds and were released.

Wright and Redican called Ray Matlock as a witness. He testified that he was a Kansas City police officer who worked for K Mart in his off-duty time. He worked in full uniform. Matlock was working on March 30 when he learned of the incident concerning Wright and Redican. Matlock testified that Conners told him that Conners wanted Wright and Redican to go to jail and that he wanted the other employees to see them going to jail. Matlock testified that he called the investigating unit of the police department and advised the unit of what was taking place. The unit told Matlock that the women did not need to be arrested at that time and there should be further investigation; Matlock communicated the unit's advice to Conners. However, Conners insisted on Matlock filling out a general ordinance violation summons for Wright and Redican. Conners signed the complaint portion of the summons, which charged Wright and Redican with stealing five cartons of cigarettes and one bag of diapers, rather than the two cartons of cigarettes that were actually in controversy.

Another police officer, who coordinated K Mart's hiring of off-duty officers, testified that a person without a previous record could be given a summons without requiring the person to go to the police station and post a bond. There was no evidence that Wright or Redican had any previous record.

K Mart's evidence was that Ostertag observed Wright place the cigarettes and diapers behind register 2 and became suspicious. He told Van Meter to go up into the observation area overlooking the cash registers and observe Wright. Van Meter went into the small observation area, where he had to lie on his stomach in order to observe the cash registers. He had a pair of binoculars, so that he could read the numbers on the register receipts. Van Meter testified that he saw Wright get the merchandise from behind register 2 and take it to Redican's counter. Significantly, Van Meter stated that Wright did not call

for the pink slip until all of the merchandise had been sacked, and that only then did Phillips come over to the register. He said Phillips did not inspect the contents of the closed sack.

According to K Mart's evidence, Matlock advised Conners, the K Mart loss prevention manager, that the charge would be heard in municipal court on May 18. Conners testified that he told Matlock he would be on his honeymoon on that date, and that Matlock told him that he would obtain a continuance.

On May 18 Wright and Redican appeared in municipal court. No one appeared on behalf of K Mart to testify against them, and the charges were dismissed. These suits followed.

■ K Mart first contends that the evidence did not establish that the detention of Wright and Redican was against their will. In this argument K Mart principally relies upon *Weiler v. Herzfeld-Philipson Co.*, 189 Wis. 554, 208 N.W. 599 (1926). In *Weiler* the court held that an employer was not liable for false imprisonment for interviewing an employee for several hours on suspicion of theft. *Weiler* emphasized that, during the entire time the employee was detained and questioned, the employee was being compensated for his time by the employer.

There was no evidence in this case that Wright and Redican were compensated for the time they were held in the personnel office and the security office during the interrogation. Such a failure of evidence was the basis for distinguishing *Weiler* in *Dupler v. Seubert*, 69 Wis.2d 373, 230 N.W.2d 626 (1975). In *Dupler* the court found that the employee was not compensated during all of the time she was detained; therefore, the court refused to apply *Weiler*. 230 N.W.2d at 632.

Even if *Weiler* were not distinguishable, this court would refuse to follow *Weiler* for the reasons set out in *Dillon v. Sears-Roebuck Co.*, 126 Neb. 357, 253 N.W. 331, 335 (1934). In *Dillon* the court held that to allow an employer to restrain an employee would be tantamount to holding that an

employer could force an employee to continue in the employment against his will.

Without the sort of presumption K Mart argues arises from *Weiler,* there is ample evidence that Wright and Redican were detained against their will. The facts that Ostertag assigned an employee to guard Wright; that Conners told both women they would be taken downtown if they did not confess; and that K Mart delivered them into the custody of the police clearly shows that Wright and Redican were not free to leave K Mart at will.

K Mart also contends that the evidence did not establish that the detention was unlawful. Under Missouri law, once the plaintiffs show an arrest without warrant, the defendant must then prove lawfulness of the arrest. K Mart failed to establish jutification as a matter of law.

The elements of false imprisonment were stated in *Schwane v. Kroger Co., Inc.,* 480 S.W.2d 113, 118 (Mo.App.1972). In *Schwane* this court quoted from *Hanser v. Bieber,* 271 Mo. 326, 197 S.W. 68, 70[2–4] (banc 1917):

> False imprisonment consists of the direct restraint of personal liberty. To establish it want of probable cause and of malice need not be proved. (Citing cases.) Unlawful detention is the basis of the action. Actual seizure or the laying on of hands is not necessary to constitute an unlawful detention. If the party is within the power of the person making the arrest, and, subject to such power, but not of his own will, goes with his captor, it is an arrest such as is contemplated to authorize an action for false imprisonment.

This court also held in *Nelson v. R.H. Macy & Co.,* 434 S.W.2d 767, 773[6] (Mo.App. 1968), that when an arrest without a warrant is shown, it is presumed that the arrest is unlawful and the burden falls on the defendant to plead and prove a legal justification for the arrest.

In this case K Mart sought to show the lawfulness of the arrest by relying upon § 537.125.2, RSMo 1978. That section gives a merchant who has reasonable grounds or probable cause to believe that a person has wrongfully taken merchandise the right to detain such person in a reasonable manner for a reasonable time to investigate the situation. K Mart contends that the evidence established as a matter of law that K Mart had reasonable grounds to believe that Wright and Redican had stolen two cartons of cigarettes. Therefore, K Mart argues, it was entitled to a directed verdict.

▮ In reviewing the evidence to determine if the plaintiffs made a submissible case, this court must view the evidence in the light most favorable to Wright and Redican and give them the benefit of all inferences that may reasonably be drawn in support of their cause of action. *Fischer v. Famous-Barr Co.,* 646 S.W.2d 819, 822[5] (Mo.App.1982). If, as in this case, the material facts are in dispute, with one version of the facts establishing reasonable grounds and another version refuting it, then it is up to the jury to determine which set of facts existed. *Linkogel v. Baker Protective Services, Inc.,* 659 S.W.2d 300, 304 (Mo.App.1983).

▮ The version of the facts most favorable to Wright and Redican shows no reasonable grounds for belief that Wright and Redican had acted wrongfully; rather, Wright and Redican's evidence was that they acted with a candor that would have been inconsistent with an intent to steal. From the evidence Wright and Redican adduced, the jury could have found that Wright made no attempt to conceal the fact that she was purchasing five cartons of cigarettes and one bag of diapers. She openly picked these items up in the store and walked around the store with them in her arms and openly placed them behind register 2. In fact it was her openness in picking up the merchandise and placing it behind the register that allowed Ostertag to observe her actions. Further, at the time she placed the merchandise behind the register she told Phillips, the head cashier, that the merchandise was hers and that she was going to pay for it when the lines were down. Phillips told her her plans were "o.k." When Wright placed the merchandise on the counter before Redican's reg-

ister, Wright told Phillips that they were ready to begin the transaction. Phillips told her to go ahead. Wright had not sacked the cigarettes at the time Phillips arrived to observe the transaction, so that the number of cartons involved and the price being charged was open and available to inspection by Phillips. If the jury believed Wright and Redican's story, then it would follow that if Van Meter truly saw the transaction, he saw Wright call for and obtain the supervision of the appropriate K Mart official, who presided over all critical parts of the transaction.

While K Mart adduced evidence that Wright did not call Phillips over until after the cigarettes were sacked and out of view, this conflict in evidence merely creates a factual issue for the jury to resolve. It cannot be said as a matter of law that the evidence was insufficient to present the question of the existence of reasonable grounds to the jury.

K Mart further argues that the detention was made in a reasonable manner and for a reasonable time and that K Mart was therefore entitled to a directed verdict. Since K Mart was unable to establish the critical element of lack of reasonable grounds for the detention, it is irrelevant whether K Mart established the other elements of § 537.125.2. Therefore, there is no reason for the court to discuss the reasonableness of the time and manner of the detention.

■ K Mart also contends the evidence was insufficient to support the instruction given to the jury, authorizing it to award punitive damages for false imprisonment if it found that K Mart acted maliciously. Malice was defined as being prompted or accompanied by ill will, spite or grudge toward Wright and Redican or toward all persons in one or more groups or categories of which they were members.

Wright and Redican adduced sufficient evidence of ill will. Matlock testified that after calling the investigation unit, he then informed Conners that the unit advised there should be further investigation and that the women should not be arrested. Matlock further testified that Conners told him that he wanted the girls to go to jail and the other employees to see them going to jail. From this evidence, the jury could conclude that Conners was motivated by ill will and spite toward Wright and Redican. There was also evidence that persons without a previous record could be given a summons, rather than being required to go to the police station or jail. From this evidence the jury could have concluded that Conners simply wanted Wright and Redican to go to jail, for malicious rather than justifiable reasons.

■ K Mart further contends that the causes of action for false imprisonment and malicious prosecution are barred by the Worker's Compensation statute, § 287.120, RSMo 1978. This argument was fully answered in *Gambrell v. Kansas City Chiefs Football Club, Inc.*, 562 S.W.2d 163, 165[1, 2] (Mo.App.1978). This court in *Gambrell* held that the Worker's Compensation statute bars a common law suit for only those damages covered by the Act and for which compensation is available under its provisions. False imprisonment and malicious prosecution actions do not seek damages covered by the Worker's Compensation Act and therefore are not barred by that act.

■ K Mart contends that Wright and Redican failed to establish their case for malicious prosecution, because they did not show lack of probable cause for the prosecution. *See Sanders v. Daniel International Corp.*, 682 S.W.2d 803, 807[1] (Mo. banc 1984).

Probable cause for initiating [a criminal] prosecution is defined as reasonable grounds for suspicion, supported by circumstances in evidence sufficiently strong to warrant a cautious man in his belief that the person accused is guilty of the offense charged. [citations omitted.] Probable cause is reasonable cause, not necessarily actual cause. We must consider the facts as the prosecuting party could have reasonably believed them to be under the circumstances at the time. *Palermo v. Cottom*, 525 S.W.2d 758, 764 (Mo.App.1975). Although the question of whether probable cause exists on a set of undisputed facts is a question of law, *see*

*Parker v. Color-Tile Supermart, Inc.,* 655 S.W.2d 598, 599 (Mo.App.1983), "[w]here conflict appears in material evidence relied on to constitute probable cause, it becomes a jury question and a submissible case is made." *Palermo,* 525 S.W.2d at 764–65.

As discussed above in the context of the false imprisonment claim, there was conflicting evidence on the key question of whether Wright and Redican sought and obtained supervision over the sales transaction or whether they avoided such supervision until the merchandise was sacked up and out of sight. This conflicting evidence on a crucial point created a question of fact, which the jury resolved in favor of Wright and Redican.

■ K Mart contends that the court erred in giving a punitive damage instruction on behalf of Wright and another on behalf of Redican on their false imprisonment claims, because this constituted a submission of multiple punitive damage instructions for a single wrongful act. Suffice it to say that the imprisonments of Wright and Redican were separate acts, although occurring at about the same time, and therefore an instruction on behalf of each concerning punitive damages was proper.

Wright and Redican each filed a motion for new trial on her claim for malicious prosecution. The court found the $1,000 jury award to each to be against the weight of the evidence. The court further found the denial of punitive damages to each was against the weight of the evidence, so as to shock the conscience of the court. The court awarded Wright and Redican new trials on their claims for malicious prosecution, but limited the new trials to the issue of actual and punitive damages. K Mart contends the new trial should encompass liability as well as damages.

■ In the malicious prosecution claim, the issues of liability and damages, particularly punitive damages, are so closely intertwined as to make it unfair to limit a new trial to the issue of damages. *See generally Nance v. Kimbrow,* 476 S.W.2d 560, 562 (Mo.1972).

Missouri courts have acknowledged the difficulty of separating the issues of liability and punitive damages in intentional tort cases. In *Ackmann v. Kenney-Toelle Real Estate Co.,* 401 S.W.2d 483, 490 (Mo. banc 1966), the Court considered an action for fraud in which the court of appeals had ordered a new trial on the issue of damages only. The Supreme Court held that, because the plaintiff sought punitive damages, it would be necessary for the jury in the new trial to hear the evidence on all issues in order to properly determine the amount of punitive damages. Therefore, the Court ordered a new trial as to all issues. Likewise, in *Owens v. Automobile Recovery Bureau, Inc.,* 544 S.W.2d 26, 35 (Mo.App.1976), this court held that in a conversion case the proof of malice required for the submission of punitive damages was inextricably tied up with the proof of conversion. Therefore, the court ordered a new trial on all issues.

In this case Wright and Redican seek punitive damages for malicious prosecution. Under *Sanders* it is necessary that the jury find the existence of ill will and spite on the part of K Mart to grant such damages. 682 S.W.2d at 815–16. This of necessity requires presentation of all of the evidence relating to the issue of liability.

Because the retrial will require the jury to hear evidence concerning liability in order to decide whether there was actual malice warranting punitive damages, the court abused its discretion in ordering a new trial limited to the issue of damages only.

The judgments in favor of Wright and Redican on their false imprisonment claims are affirmed. The orders granting new trials to Wright and Redican on their malicious prosecution claims are affirmed, but the order limiting the new trial to the issue of damages is reversed and this cause is remanded with directions to order the new trials as to all issues on the malicious prosecution claims.

All concur.