ADAMS v NATIONAL BANK OF DETROIT

Docket No. 93463. Argued March 4, 1993 (Calendar No. 16). Decided
September 29, 1993. Rehearing denied *post,* 1203.

Michael Adams brought an action in tort in the Wayne Circuit
Court against the National Bank of Detroit, his employer, for
damages arising from his mistaken arrest for fraudulent with-
drawals made by another Michael Adams who was a temporary
employee of the bank. Shortly after filing the action, the
plaintiff committed suicide, and his father, Amos Adams, as
personal representative of his estate, continued the action and
added a claim for wrongful death. The plaintiff asserted that
the knowledge of certain of the bank's employees regarding his
identity and the circumstances leading to his arrest could be
imputed to the bank to constitute the state of mind necessary
to commit an intentional tort. The bank argued that the action
was barred by the exclusive remedy provision of the workers'
compensation act. The court, John H. Hausner, J., denied the
bank's motion for accelerated judgment. A jury found the bank
liable for injuries resulting from false arrest, negligence, gross
negligence, wilful and wanton misconduct, and intentional
infliction of emotional distress, but no cause of action for
malicious prosecution. The court entered judgment for the
plaintiff. The Court of Appeals, MURPHY, P.J., and GILLIS and
WAHLS, JJ., affirmed in an unpublished opinion per curiam
(Docket No. 112711). The defendant appeals.

In opinions by Justice LEVIN, by Justice BOYLE, by Justice
MALLETT, joined by Chief Justice CAVANAGH, and by Justice
BRICKLEY, joined by Justices RILEY and GRIFFIN, separate ma-
jorities of the Supreme Court *held:*

I. An employee or agent of a corporation must act with the
requisite intent to impute an intentional tort to a corporation.

II. Under the facts of the case, the plaintiff may pursue an
action for false imprisonment.

Reversed and remanded for a new trial.

Justice LEVIN, stated that the estate may maintain an action
for false imprisonment. However, there is no separate cause of
action for negligence, gross negligence, or wilful and wanton
misconduct in causing the decedent's false arrest. In addition,

the estate may not maintain an action for intentional infliction of emotional distress.

The Workers' Disability Compensation Act provides benefits for diminution or loss of earning power that was caused by physical and mental injuries suffered on account of employment. The exclusive remedy provision of the act bars recovery for physical or mental injury resulting from accident. It does not bar claims for invasion of a worker's interest in being free from interference with other interests such as injuries to reputation resulting from defamation because the gist of an action for defamation is injury to reputation, irrespective of any physical or mental harm. Nor does it bar claims of malicious prosecution, because the essence of that tort is not physical or mental injury, but interference with the right to be free from unjustifiable litigation. As with the torts of defamation and malicious prosecution, the essence of false imprisonment is not physical or mental injury. Rather, it is interference with a person's liberty interest; no showing of physical or mental injury is required. An intent to confine any person is sufficient, and thus an innocent or reasonable mistake of identity will not relieve the actor of liability. Thus, the exclusive remedy provision does not bar recovery for physical or mental injury arising out of false imprisonment.

A hostile intent to invade the interests of another is not an essential element of false imprisonment. Although intent is necessary, malice, in the sense of ill will or a desire to injure, is not. Moreover, the doctrine of transferred intent applies to the tort of false imprisonment, and a party can be subject to liability for imprisoning one person, although intending to imprison another. Even a reasonable mistake with respect to identity is not a defense to false imprisonment.

In this case, the estate presented sufficient evidence of all the elements of false imprisonment. The jury reasonably could have concluded that NBD, through its employee, had the requisite state of mind to cause the false arrest of the decedent; the employee gave the decedent's name to the police with the substantial certainty that an arrest would follow.

Justice BOYLE, concurring in part and dissenting in part, stated that while reversal of the verdict regarding intentional tort is required, the plaintiff offered sufficient evidence to support a claim of instigation of false imprisonment. The liberty interest protected is not subject to the exclusive remedy provision of the workers' compensation act. On retrial, the estate may recover damages for the decedent's suicide only

upon an evidentiary showing that would satisfy a higher standard than chain of causation.

Justice MALLETT, joined by Chief Justice CAVANAGH, stated that, on the basis of the facts in this case and the current state of the law, sufficient facts were pleaded and proved to establish corporate responsibility for the intentional infliction of a tort.

Intent extends to consequences an actor believes are substantially certain to follow from actions. Hostile intent or intent to cause harm is not required for liability; rather, there merely need be a voluntary act done with reckless disregard of consequences that are substantially certain to result. Because an NBD supervisor made a conscious decision to disregard NBD procedures for releasing information to the police, a jury reasonably could infer that erroneous information knowingly and intentionally was disseminated with the knowledge that egregious injury was substantially certain to result. Further, the corporate decision to maintain silence with respect to the arrest was an intentional act made at a time when it was clear that the decedent was suffering emotionally from the result. Thus, the jury correctly imputed liability to the corporation.

Justice BRICKLEY, joined by Justices RILEY and GRIFFIN, stated that the plaintiff failed to establish a cause of action for intentional tort. In determining whether a corporation has committed an intentional tort, the collective knowledge of the corporation's employees cannot be amalgamated to establish the requisite intent where no employee or agent possessed that state of mind. The circuit court and the Court of Appeals did not have jurisdiction to determine whether the decedent's injuries arose out of and in the course of his employment, requiring reversal and remand to the circuit court for further proceedings.

Generally, it is appropriate to consider the collective knowledge of a corporation to determine whether it has committed a crime. A corporation is held to possess the collective knowledge of its employees; it cannot plead ignorance on the ground that no employee possessed all relevant knowledge so as to be able to realize its import. Showing that a corporation has committed an intentional tort requires something more than mere knowledge.

An intentional tort involves an awareness that an act is being committed and an intent to invade the interests of another. Deeming a corporation to have intended to commit a tortious act solely on the basis of imputed disconnected facts is a fiction that conflicts with the basic principles underlying the law of intentional torts. While a corporation can be deemed to

know something on the basis of collective knowledge, it does not follow from a showing of such knowledge that it can intend an act. Accordingly, although a collective knowledge instruction may be appropriate in contexts such as determining whether a corporation was negligent or whether it committed a crime, it is error to allow a jury to rely on such an instruction to establish the state of mind requisite to the commission of an intentional act.

The Court of Appeals and the trial court did not have jurisdiction to determine whether the decedent's injuries arose out of and in the course of employment. Only the Bureau of Workers' Disability Compensation can make that determination initially. Thus, the courts erred in exercising jurisdiction over the plaintiff's tort claims in the absence of such a finding.

*Goodman, Eden, Millender & Bedrosian* (by *Robert A. Koory, Christopher Holliday,* and *Mark Granzotto*) for the plaintiff.

*Kohl, Secrest, Wardle, Lynch, Clark & Hampton* (by *Roger F. Wardle* and *Janet Callahan Barnes*) for the defendant.

Amicus Curiae:

*Ira Burnim* and *Sheldon J. Stark* for the Mental Health Law Project.

LEVIN, J. The question presented is whether the exclusive remedy provision of the Workers' Disability Compensation Act[1] precludes the Adams estate from maintaining causes of action against the National Bank of Detroit arising out of the arrest of Michael Bret Adams.

Adams, an employee of the National Bank of Detroit, was erroneously arrested on a charge of making fraudulent withdrawals from NBD. The withdrawals had actually been made by another NBD employee, Michael Ansara Adams.

[1] MCL 418.131; MSA 17.237(131).

Adams was arrested after Mary Miller Mach, an NBD employee, had erroneously given the police his address and phone number. The error was discovered and the charges were dropped. Adams, nevertheless, suffered serious trauma and, approximately eight months after he was arrested, committed suicide.

The jury awarded the Adams estate $1,529,154.41 for false arrest, negligence, gross negligence, wilful and wanton misconduct, and intentional infliction of emotional distress. The jury further found that there was no cause of action for malicious prosecution. The Court of Appeals affirmed.[2]

I would hold that the Adams estate may maintain an action for false imprisonment (false arrest), and join in remand to the trial court. There is, however, no separate cause of action for negligence, gross negligence, or wilful and wanton misconduct in causing Adams' false arrest.[3] I would also hold that the Adams estate may not maintain an action for intentional infliction of emotional distress.[4]

I

The workers' compensation act provides benefits for diminution or loss of earning power caused by

[2] Unpublished per curiam opinion, decided December 12, 1991 (Docket No. 112711).

[3] See n 11.

[4] The mistake in identifying Adams as the culprit was neither "outrageous" nor done with bad purpose or intent, and, therefore, the Adams estate may not maintain an action for intentional infliction of emotional distress.

See also *Mounteer v Utah Power & Light Co*, 823 P2d 1055, 1057 (Utah, 1991), and *Foley v Polaroid Corp (Foley I)*, 381 Mass 545, 551; 413 NE2d 711 (1980), discussed in notes 8 and 9.

"physical and mental injuries suffered on account of employment."[5]

The exclusive remedy provision of the workers' compensation act bars recovery for physical or mental injury resulting from accident,[6] and does not bar claims for invasion of a worker's interest in being free from interference with other inter-

---

[5] *Sewell v Bathey Mfg Co,* 103 Mich App 732, 736; 303 NW2d 876 (1981). Similarly see *Mounteer v Utah Power & Light Co,* n 4 *supra,* stating that Utah's worker's compensation act provides compensation for "diminution or loss of earning power caused by a physical or mental injury or by death sustained in the work place"; *Foley I,* n 4 *supra,* stating that the Massachusetts' workers' compensation act covers "physical and mental injuries arising out of employment."

The workers' compensation act does not define a chapter 3 personal injury, and thus does not identify specific injuries. A 1980 amendment provides that certain disabilities and conditions shall be compensable if caused by the employment in a "significant manner." MCL 418.301(2); MSA 17.237(301)(2). The act does, however, define a chapter 4 personal injury concerning diseases or disabilities due to causes and conditions characteristic of and peculiar to the business of the employer. MCL 418.401(1)(b); MSA 17.237(401)(1)(b).

[6] See *Beauchamp v Dow Chemical Co,* 427 Mich 1; 398 NW2d 882 (1986), in which this Court held that the exclusive remedy provision bars recovery by an employee for accidental injury and not for an intentional tort, and declared that where the employer knew that the injury was substantially certain to occur from the employer's intentional act, the employer may be found to have committed an intentional tort. In *Beauchamp,* the plaintiff sought recovery for physical and mental injury resulting from exposure to "Agent Orange" during employment with Dow Chemical.

The Legislature amended the exclusive remedy provision in response to *Beauchamp* to provide that the worker's exclusive remedy against the employer "for a personal injury or occupational disease" is recovery of benefits provided by the workers' compensation act, and that the only exception is an intentional tort, and to provide that an intentional tort occurs when the worker is injured "as a result of a deliberate act of the employer and the employer specifically intended an injury." 1987 PA 28, amending MCL 418.131(1); MSA 17.237(131)(1).

I see no need to decide whether the amendment is retroactive because the amendment concerns the standard for determining the line between an accidental and intentional tort where the interest of the worker is freedom from physical and mental injury. The amendment does not bar or concern intentional torts where physical or mental injury is only incidental to the primary interest protected, such as the interests protected by the actions for defamation (reputation), malicious prosecution (unwarranted litigation), and false imprisonment (unlawful arrest or confinement). See n 14.

ests, such as injuries to reputation resulting from defamation.[7]

The exclusive remedy provision does not bar a claim for defamation because "the gist of an action for defamation is injury to reputation, irrespective of any physical or mental harm." *Foley v Polaroid Corp (Foley I)*, 381 Mass 545, 551-552; 413 NE2d 711 (1980);[8] *Braman v Walthall*, 215 Ark 582; 225 SW2d 342 (1949); *Howland v Balma*, 143 Cal App 3d 899; 192 Cal Rptr 286 (1983); *Mounteer v Utah Power & Light Co*, 823 P2d 1055 (Utah, 1991).[9] Similarly, the exclusive remedy provision does not bar a claim for malicious prosecution because the "essence of the tort is not physical or mental injury, but interference with the right to be free from unjustifiable litigation."[10]

---

[7]  Other jurisdictions have recognized that not all harms occasioned by the employment relationship qualify as compensable injuries under the Act. Such harm includes: injuries to reputation resulting from libel, malicious prosecution and false imprisonment, invasion of privacy, and false arrest. [*Battista v Chrysler Corp*, 454 A2d 286, 289 (Del Super, 1982).]

[8] In *Foley I*, the court "recognized the conceptual problem inherent in the employee's including physical and mental injury as elements of damage in the defamation claim." *Foley, supra* at 552. The "conceptual problem" was that the plaintiff was seeking recovery for physical and mental injuries, for which compensation is provided under the act, in addition to seeking damages for harm to his reputation. The court concluded that "to block the main thrust of this action because of peripheral items of damages, when a compensation claim could not purport to give relief for the main wrong of injury to reputation, would be incongruous, and outside the obvious intent of the exclusiveness clause." *Id.*

[9] In *Mounteer*, the court said that courts have developed a test to determine whether a cause of action arising out of a work-related injury is barred by the exclusive remedy provision. The test asks whether physical or mental injury is an indispensable element of the tort. If physical or mental injury is not an indispensable element, a cause of action based on that tort is not barred. Thus, a cause of action for intentional infliction of emotional distress is barred because emotional harm is an indispensable element of that tort. *Foley I* and *Mounteer, supra*. A cause of action for false imprisonment is not barred because neither physical nor mental injury is an essential element of that tort.

[10] *Foley I, supra* at 552. See also *Battista*, n 7 *supra* at 289.

As with the torts of defamation and malicious prosecution, the gist of false imprisonment is not physical or mental injury. The gist of an action for false imprisonment is interference with the liberty interest. No showing of physical or mental injury is required. An intent to confine *any* person is sufficient, and thus an innocent or reasonable mistake of identity will not relieve the actor of liability.[11]

In Prosser and Keeton's words, the cause of action for false imprisonment "protects the personal interest in freedom from restraint of movement."[12] Because "there is no relation between the kind of injuries envisioned by the Work[ers'] Compensation law and the injury" to the liberty interest that is caused by false imprisonment, the exclusive remedy provision does not bar this cause of action.[13]

In *Moore v Federal Dep't Stores*, 33 Mich App 556, 559; 190 NW2d 262 (1971), the Court of Appeals concluded that the exclusive remedy provision did not bar a claim for false imprisonment. The Court said that "the gist of an action for false imprisonment is unlawful detention irrespective of any physical or mental harm." The Court agreed with Moore "that her humiliation, embarrassment, and deprivation of personal liberty are not the type of 'personal injury' " covered by the workers' compensation statute.[14]

---

[11] See part II and accompanying text.

Because an action for false imprisonment can be maintained without regard to the degree of fault of the actor, a separate cause of action for negligence, gross negligence, and wilful and wanton misconduct in causing Adams' false arrest cannot be maintained.

[12] Prosser & Keeton, Torts (5th ed), § 11, p 47.

[13] *Battista*, n 7 *supra* at 289; *Foley v Polaroid Corp (Foley II)*, 400 Mass 82; 508 NE2d 72 (1987); *Redican v K mart Corp*, 734 SW2d 864 (Mo App, 1987).

[14] The holding in *Moore* cannot properly be questioned on the basis

Nor does the exclusive remedy provision bar recovery for physical and mental injury arising out of false imprisonment. *Foley v Polaroid Corp (Foley II),* 400 Mass 82; 58 NE2d 72 (1987). In *Foley II,* Polaroid did not argue that the exclusive remedy provision barred a cause of action for false imprisonment, but rather contended that the plaintiff could not seek damages for physical or mental injury arising out of false imprisonment. The court rejected the argument, stating that the inquiry should be "structured in terms of what *claims* an employee could assert against his employer in an action at law—not in terms of the *injuries* for which the employee could seek recompense." *Id.* at 93. (Emphasis in original.)[15]

that it was decided before *Beauchamp* or the 1987 amendment of § 131 of the act.

The question whether harm to the liberty interest is the kind of harm covered by the workers' compensation act is antecedent to the issue in *Beauchamp.*

Suppose that during the course of employment, an employer broke the eyeglasses of a worker or bashed in the windshield of his automobile, and that the worker filed a claim for trespass to chattels against his employer, and that the employer claimed that the exclusive remedy provision barred the claim. The court would first consider whether broken eyeglasses or windshields are the kind of harm for which recovery is provided under the workers' compensation act. That was the inquiry in *Behl v General Motors,* 25 Mich App 490; 181 NW2d 660 (1970), in which the Court set aside an award of workers' compensation because it concluded that damage to a hearing aid is not a "personal injury" within the meaning of the workers' compensation act.

Although the act of an employer in breaking eyeglasses or a windshield or a hearing aid may have been intentional within the meaning of *Beauchamp* or § 131 as amended, it is not the kind of harm for which workers' compensation benefits are payable. See n 6.

[15] In *Dockins v Ingles Markets, Inc,* 306 SC 287; 411 SE2d 437 (1991), the South Carolina Supreme Court followed *Foley I* as clarified in *Foley II* and held that a worker's cause of action for slander was not barred by the exclusive remedy provision because the gist of the action is injury to reputation, and that the worker could recover for emotional injuries that resulted from the slander.

In *Mounteer, supra,* the worker developed posttraumatic stress disorder after a mine fire broke out while he was on duty. After the worker returned to work, the employer's fire investigator accused him

The workers' compensation act provides benefits for disability arising out of physical or mental injury resulting from employer failures to provide a safe workplace. Recovery of workers' compensation benefits is the exclusive remedy unless a failure to provide a safe workplace constitutes an intentional tort as defined in *Beauchamp v Dow Chemical Co*, 427 Mich 1; 398 NW2d 882 (1986), and the 1987 amendment of § 131 of the act.

A claim for false imprisonment does not implicate the safety of the workplace. As with claims seeking recovery for physical, mental, or emotional injury resulting from employer discrimination in violation of civil rights acts—which are not barred by the exclusive remedy provision, *Boscaglia v Michigan Bell Telephone Co*, 420 Mich 308, 315; 362 NW2d 642 (1984)—the "evil" at which the action for false imprisonment is aimed is different from failures to maintain workplace safety, for which workers' compensation benefits are provided.

II

*Collective* corporate knowledge and intent are not real issues in the estate's claim for false imprisonment because an NBD employee, Mary Miller Mach, possessed the requisite state of mind to cause false imprisonment. An actor can commit an

of "being on drugs" and broadcast this accusation over the loudspeaker at the worksite. The worker then brought an action for slander and sought damages for emotional distress. The Utah Supreme Court rejected the employer's argument that the worker's action should be barred because he sought damages "for personal injuries which have a medical identity, physical and mental impact, and are medically treated." *Id.* at 1057. The court said that "it would be an erroneous oversimplification for us to lump together all of plaintiff's claimed damages, both to his person and to his reputation, and hold that since all of his damages stemmed directly or indirectly from the accidentally caused mine fire, workers' compensation should be his sole remedy." *Id.*

intentional tort if the actor intends to act and knows that another person will be harmed thereby.[16]

More specifically, a hostile intent to invade the interests of another is not an essential element of false imprisonment. "Although intent is necessary, malice, in the sense of ill will or a desire to injure, is not. There may be liability although the defendant believed in good faith that the arrest was justified, or that the defendant was acting for the plaintiff's own good." Prosser & Keeton, Torts (5th ed), § 11, p 53.[17]

Even more specifically, a defendant cannot escape liability for false imprisonment on the basis of a mistake concerning the plaintiff's identity. In Prosser and Keeton's words:

> Even if intent to confine the individual is necessary, it need not be with knowledge of who the plaintiff is; and, as in the case of other intentional interferences with the person or property, an innocent, and quite reasonable mistake of identity will not avoid liability. [*Id.*]

The California Court of Appeals observed concerning intent in false imprisonment:

> We do point out, however, that, contrary to the view expressed by defendants, plaintiff was not

---

[16] Prosser & Keeton, n 12 *supra,* pp 34-37; 1 Restatement Torts, 2d, § 8A, p 15; *Bradley v American Smelting & Refining Co,* 104 Wash 2d 677, 683; 709 P2d 782 (1985).

[17] See also *Murphy v Nassau Co,* 154 Misc 2d 605, 607; 585 NYS2d 951 (1992) ("The best of intentions will not legalize a false arrest and it matters not whether the arresting party has good or bad motives, good or bad faith, malice or lack thereof. These elements are immaterial in an action for false arrest"); *Zayre of Virginia, Inc v Gowdy,* 207 Va 47, 51; 147 SE2d 710 (1966) ("To maintain an action for false imprisonment it is not necessary to show malice, ill will or the slightest wrongful intention, and neither the good faith of a defendant nor that of his employee will defeat a plaintiff's right to recover").

required to allege that defendants *knew* plaintiff and specifically acted with the intent to have *him* arrested. . . . The doctrine of transferred intent has long been recognized to apply to the tort of false imprisonment. . . . Under this doctrine the intention to confine any person is a sufficient intent to render one liable to the person actually confined. It is immaterial that the actor did not know the identity of the person he intended to confine; nor does it matter that the actor intended to affect some person other than the one actually confined. . . . Thus an allegation that the defendant intended to induce an arrest of *someone* would have been sufficient.[18] [*Du Lac v Perma Trans Products, Inc,* 103 Cal App 3d 937, 944; 163 Cal Rptr 335 (1980). Emphasis in original.]

In the instant case, the jury could reasonably conclude that NBD—through its employee Mary Miller Mach—intended to cause the false arrest of Michael Adams. Mach gave Adams' name to the West Bloomfield Police Department when Officer Mero called seeking information "[i]n order to arrest the suspect . . . ." In the context in which Mary Miller Mach named Adams as the suspect, it being substantially certain that an arrest would follow from her disclosure, it is not a defense that NBD meant to cause the arrest of another Michael Adams or that NBD had no desire to confine the Michael Adams whose estate brings this action.[19]

---

[18] See also 1 Harper, James & Gray, Torts (2d ed), § 3.7, p 291 ("Nor will a mistake in the identity of the plaintiff constitute a defense. The intention to confine another person will make the defendant liable to the person actually confined although there is no desire or intent on the part of the defendant to harm the plaintiff"); 1 Restatement Torts, 2d, § 43, comment a, p 66 ("To make the actor liable for false imprisonment under the rule stated in § 35, it is not necessary that his act be done with the intention of imposing a confinement upon the other. It is enough if he intends to confine a third person and the other is in fact confined").

[19] See *Wilson v Bonner,* 166 Ga App 9, 15; 303 SE2d 134 (1983). The court said that "[i]f there has been a mistake made as to the name in

III

The Adams estate presented sufficient evidence of all the elements of false imprisonment. The elements are: an act committed with the intention of confining another,[20] the act directly or indirectly results in such confinement, and the person confined is conscious of his confinement.[21]

NBD claims that the trial court erred in submitting the false imprisonment claim to the jury because its actions were not sufficient to meet the standard for instigation of, or participation in, a false arrest, and because the confinement was incident to a valid arrest pursuant to a facially valid warrant.

A person is not subject to liability for false arrest where the person merely gives information to the police and the police use their own judgment in deciding whether to make an arrest, *Lewis v Farmer Jack Div, Inc,* 415 Mich 212, 219, n 3; 327 NW2d 893 (1982). The trier of fact could properly find that this case is not within that rule.

It appears that NBD did more than simply provide information to the police, and the trier of fact could find that the police did not use their independent judgment in making the decision to arrest. NBD's internal security department conducted the investigation leading to the arrest. The West Bloomfield officer in charge of the case testified

the warrant, and the prosecutor is responsible for such mistake, the prosecutor might be liable [for false imprisonment], but the officer [who made the arrest] would be blameless." The clear implication of this statement is that the prosecutor could be liable for false arrest although he did not know or intend that the wrong suspect would be arrested as a result of his actions. The basis of NBD's liability— through Mary Miller Mach's actions—is similar to the liability of the prosecutor in the passage from *Bonner.*

[20] The Restatement, n 18 *supra,* equates intent with knowledge that a harm will result from one's actions.

[21] *Id.,* § 35, p 52.

that he treats information received from the security departments of large corporations differently than information received from ordinary citizens. He indicated that he is more apt to rely on the security department's identification of the suspect. When an officer "act[s] on [the] judgment" of the defendant, "it may well be said that [the] defendant directed the arrest,"[22] and the trier of fact here could properly so find.

Nor is NBD relieved of liability merely because the arrest was made pursuant to a facially valid arrest warrant.[23] While the general rule would shield an arresting officer from liability who acts in good faith pursuant to a facially valid warrant, it does not protect a person who instigates the issuance of the warrant where the officer acted on that person's judgment.[24]

IV

The estate seeks to recover for loss resulting from Adams' suicide. The chain of causation test, stated in *Hammons v Highland Park Police,* 421 Mich 1; 364 NW2d 575 (1984), is, in my opinion, preferable to the rule stated in the concurring opinion[25] for determining whether there is the requisite causation.

---

[22] *Maliniemi v Gronlund,* 92 Mich 222, 227; 52 NW 627 (1892).

[23] See *Lewis, supra* at 218, n 2, stating the general rule that liability for false arrest cannot flow from a lawful arrest.

[24] The Michigan Court of Appeals said:

While a complaining witness is immune from liability for false arrest where a valid complaint was issued, this immunity does not extend to instances where the complaining witness does not act reasonably: for example, when he knew, or should have known, that, were it not for his mistake, the arrest warrant would not have been issued. [*Raudabaugh v Baley,* 133 Mich App 242, 248; 350 NW2d 242 (1983). See also *Wilson v Bonner,* n 19 *supra.*]

[25] The view stated in the concurring opinion finds some support in 2

I join in remand to the circuit court for a new trial on the claim for false imprisonment.

BOYLE, J. (*concurring in part and dissenting in part*). I agree with Justice BRICKLEY's conclusion that under these circumstances some employee must act with the requisite intent to impute an intentional tort to a corporation. Because the jury instruction regarding composite knowledge allowed the factfinder to determine liability without a finding of the intent requisite to discrete claims, I also agree that reversal of the verdict is required.

However, I agree with Justice LEVIN that, viewed in a light most favorable to the plaintiff, the evidence is sufficient to support a claim of instigation of false imprisonment and that the liberty interest protected is not subject to the exclusive remedy provision of the workers' compensation act.* On retrial, plaintiff may recover damages for the decedent's suicide only upon an evidentiary showing that would satisfy a higher standard than chain of causation. *Jamison v Storer Broadcasting Co,* 511 F Supp 1286 (ED Mich, 1981). Remand is without prejudice to the trial court's consideration regarding whether the plaintiff's other claims should be remanded to the Bureau of Workers' Disability Compensation.

MALLETT, J. Because we believe that, on the basis of these facts and the current state of the

Restatement Torts, 2d, § 455, p 493. The view there stated is that of the reporter, Professor Prosser (Prosser & Keeton, Torts [5th ed], § 44, p 310). Professors Harper, James and Gray acknowledge that there is support in the cases for the view expressed in the Restatement, but state that the chain of causation test is sounder (4 Harper, James & Gray, Torts [2d ed], § 20.5, n 41, p 159), and I agree.

* My agreement is based upon my belief that MCL 418.131; MSA 17.237(131), as amended by 1987 PA 28, is to be given prospective application.

law, the plaintiff pleaded and proved sufficient facts to establish corporate responsibility for the intentional infliction of a tort, we write separately. Because we disagree with Justice Brickley's determination that both the jury and the Court of Appeals improperly concluded that the defendant committed certain intentional torts, it is necessary to present a counter statement of facts.

I. FACTS

A

In September of 1991, NBD became aware of the fact that one of its temporary contract employees,[1] Michael A. Adams, had made fraudulent withdrawals from an account of one of its customers. One of these withdrawals had occurred at an NBD branch in Bloomfield Hills, Michigan. NBD security officer, Richard Michalski, was assigned to investigate the fraudulent withdrawals. Another NBD employee went to the Bloomfield Hills Police Department to deliver a written report on the basis of Mr. Michalski's investigation to file a complaint. On the basis of the information provided by NBD, the police prepared an incident report. The report stated that the suspect in the case was employed by NBD's downtown branch. It further indicated that the information about the suspect was incomplete, and that Mr. Michalski had much more information.

Information not provided by NBD when it filed its complaint included the suspect's date of birth,

---

[1] The bank on occasion hired employees on a temporary basis to perform certain services from a company called Arrow Temporary Services. Michael Ansara Adams was one of those persons paid, not by the bank, but by the agency, and for whom the bank did not maintain a personnel file.

telephone number, and physical description.[2] Thus, before seeking a warrant, the police officer assigned to the case, William Mero, called the NBD security department to talk to Mr. Michalski. Mr. Michalski was not available at the time, and Officer Mero spoke instead to Mary Mach. When Officer Mero asked for the suspect's date of birth and home telephone number, according to Ms. Mach's testimony, she could not locate either the index cards or the file that would have contained this information. Ms. Mach then resorted to NBD personnel records for this data. When she did so, she obtained information regarding the decedent. This erroneous information resulted in the arrest and arraignment of an innocent man.

Ms. Mach was then serving as a supervisor in NBD's security department and was required to keep abreast of all cases in the office. She originally testified that the first time she became aware of the Adams file was when she received a telephone call from Officer Mero. However, a stamp[3] on the outside cover of the office investigation file indicated that Ms. Mach had reviewed the file on September 29, 1981, more than one week before her telephone conversation with Officer Mero.

Moreover, Ms. Mach's testimony indicated that she was aware that, at the time of her conversation with Mero, the suspect was a contract employee. She also indicated that NBD's procedures required her to keep her superiors aware of any developments and any investigation pertaining to

---

[2] Physical descriptions were given of Mr. Adams that showed he was well over six feet tall and weighed about 160 pounds. His home address was known as well as his birthday, phone number, and social security number.

[3] The stamp indicates that Ms. Mach should have reviewed the entire file. Thus, had Ms. Mach followed bank procedures and reviewed the entire file, she would have been aware that the perpetrator of the fraudulent withdrawals was a contract employee, not a full-time employee of NBD.

NBD employees. When she was asked at trial whether she had advised her superiors of her conversation with Officer Mero, she testified that she had not been required to do so because the actual suspect was a contract employee, not a regular NBD employee. Her testimony that she first learned of this matter at the time of the call from Officer Mero was also directly contradicted by her associate, Mr. Michalski, who indicated that he had followed established procedures by advising Ms. Mach of his investigation on a daily basis. In addition, Ms. Mach's supervisor, Albert Schwaller testified that Ms. Mach "had been advised of the case right along." Thus, Mr. Schwaller confirmed that Ms. Mach knew that the suspect was a contract employee who worked for NBD through Arrow personnel.

Mach knew that the suspect was a temporary employee, yet she released information regarding a permanent employee. She clearly was aware of the distinction from the fact that she failed to notify her supervisor about her conversation with Officer Mero.

Ms. Mach's statement that the security file pertaining to the investigation could not be located when Officer Mero called is open to serious question. In this file was a form containing the name Michael Adams and listing a phone number. This, however, was not the telephone number of the actual suspect; rather, it was decedent's home phone number. The plaintiff argues that the only person who could have confused the actual suspect and the decedent was Ms. Mach. Thus, plaintiff argues, the fact that decedent's home phone number was in the file provides dramatic support for plaintiff's claim that Mach was in possession of the file at the time she provided the erroneous information to Officer Mero.

Three witnesses employed in NBD's security department testified that Ms. Mach's dissemination of the information to Officer Mero, even accepting her version of the events, was in violation of established NBD procedures.[4] Mr. Michalski indicated that under NBD guidelines, only the investigator in charge of a file was to release such information to the police. The only exception to the rule, according to Michalski, is when the person releasing the information either had the file or had actual knowledge of the facts being revealed.

Mr. Schwaller also testified that under NBD procedures, a person releasing information of this type should have either the index cards or the file. If the person had neither, the information was not to be released.

Finally, Carl Carter, NBD's Vice President for Corporate Security, testified that he agreed that the information Ms. Mach provided the officer should not have been given. As a result of the erroneous information provided by Ms. Mach, Officer Mero called Mr. Adams and arranged for him to turn himself in to the West Bloomfield police. However, before the date set for his arraignment, Mr. Adams went to his superiors at the bank to advise them that a mistake had been made. Completely distraught over the accusations lodged against him and his impending arrest, Mr. Adams

---

[4] NBD's written procedures provide the following:

When NBD is the complainant in a criminal prosecution, any records or documents needed by law enforcement personnel for successful prosecution can be and should be provided by the investigator assigned to the investigation without being served with a subpoena. However, when it is necessary for NBD to produce records or documents relating to legal proceedings, where NBD is not the complainant, a subpoena must be served on NBD through the NBD Law Department. Subpoenas will be accepted if mailed.

attended a meeting that included several of his supervisors and Richard Wolfe, the head of his department. Mr. Wolfe called NBD's security department and talked to Mr. Schwaller. Schwaller contacted the police and confirmed that Mr. Adams was going to be arrested on the basis of the complaint issued by NBD. Without any further investigation, Mr. Schwaller then called Mr. Wolfe back and told Mr. Adams to report to the police.

Mr. Adams went to the police department on October 14, 1981. He was arrested, handcuffed, and later arraigned in district court.

His arrest and the accusations leading to his arrest had an immediate and devastating effect on him. The pain was compounded by NBD's failure to provide an apology. Jean Ristagno, a vice president of NBD, testified that she was aware that Mr. Adams wanted an apology. Mr. Schwaller testified that he and another employee were advised not to interview Mr. Adams or make an apology. Furthermore, testimony from psychiatrists indicated that his depression increased because of this treatment by fellow employees. He went to work on October 14, 1981, emotionally distressed. By the following Monday, five days after his arrest, he went to the Sinai Hospital emergency room for treatment of distress that he was experiencing as a result of the accusations. During the remainder of October, he attempted to return to work, but was never able to complete his entire shift.

On October 29, 1981, Mr. Adams' anxiety required him to take a medical leave. During the months that followed, he spent over one month as an inpatient at the Sinai Hospital psychiatric unit, and underwent additional weeks of treatment in Sinai's outpatient program.

In March of 1982, he was examined by a psychiatrist from NBD who pronounced him fit to return

to work. That same month, NBD caused a notice of dispute to be filed with the Bureau of Workers' Disability Compensation, which indicated that it would not pay workers' compensation benefits for the period covered by Mr. Adams' medical leave because his condition did not arise "out of or during the course of Employment." Mr. Adams returned to work from April 27 to June 1, 1982, where his co-workers and supervisor found him to be a completely different person. During this period, he continued treatment with a psychiatrist, Dr. Nargis Singapore, who confirmed that when he returned to work, his major depression resulting from his arrest had increased, not diminished. On June 2, 1982, Mr. Adams committed suicide.

II

There are two conceptual hurdles that the plaintiff must clear: (1) whether, on the basis of these facts, liability for an intentional tort may be imputed to the corporate entity, and (2) if that proposition is true, whether on these facts an intentional tort exists.

A

Even if one accepts Justice BRICKLEY's test, we contend that more than enough evidence exists in this case for the proper imposition of corporate intentional tort liability.

Justice BRICKLEY maintains that showing that a corporation committed an intentional tort requires something more than mere knowledge. He quotes the following as supporting authority:

The intent with which tort liability is concerned is not necessarily a hostile intent, or a desire to do

any harm. Rather it is an intent to bring about a
result which will invade the interests of another in
a way that the law forbids. [Prosser & Keeton,
Torts (5th ed), § 8, p 36.]

Note, however, that the same authority inter-
prets intent to also extend to those consequences
the actor believes are substantially certain to fol-
low from what he does. *Id.*

Prosser and Keeton also delineate the three
most basic elements of intent. They state the
following:

   (1) it is a state of mind
   (2) about consequences of an act (or omission)
and not about the act itself, and
   (3) *it extends not only to having in the mind a
purpose (or desire) to bring about given conse-
quences but also to having in mind a belief (or
knowledge) that given consequences are substan-
tially certain to result from the act.* [*Id.* at 34.
Emphasis added.]

Justice Brickley's analysis suggests that the
actor must intend or desire the explicit or precise
outcome that arises from his tortious act. We
disagree. A deliberate act is simply a voluntary
one.[5] In the instant case, Mach, as the supervisor
in nbd's security department, was required to stay
abreast of all cases in her office. In addition, she
was responsible for assigning cases and for review-
ing them before their completion. She was also the
immediate supervisor of the investigating agent,

[5] It has long been established that a wrongdoer takes an injured
person as he finds him, and, that, if the defendant's wrongful conduct
is proved by a preponderance of the evidence to be the proximate
cause of the aggravation of a latent disability, he is liable for such
aggravation regardless of whether he had knowledge of the disability.
*McNabb v Green Real Estate Co,* 62 Mich App 500, 518; 233 NW2d
811 (1975), citing as supporting authority *Schwingschlegl v City of
Monroe,* 113 Mich 683; 72 NW 7 (1897).

Mr. Michalski. Because of the nature of the security department, NBD had established procedures for the releasing of information to law enforcement officials. Because Mach was a supervisor, it is reasonable to infer that she was aware of NBD's procedures.

According to Ms. Mach's testimony, she released information to Officer Mero without possession of the file or the benefit of actual knowledge. In so doing, she claimed that she complied with NBD procedures. Contrary to her testimony, three NBD agents testified that because Mach was not the investigator in charge of this case, and according to her testimony did not have the file or actual knowledge, she violated NBD policy when she released the information to Mero. In addition, a jury may reasonably infer from the facts that Mach knowingly and intentionally gave out erroneous information because she knew that the suspect was a temporary employee. A stamp on the NBD investigation file indicated that Ms. Mach reviewed the file on September 29, 1981, more than one week before her telephone conversation with Officer Mero. Equally important, Mr. Michalski testified that he advised Ms. Mach of what was happening in his Adams investigation on a daily basis. Moreover, Ms. Mach's own testimony provides support for the jury's conclusion. Ms. Mach further testified that NBD procedures required her to keep her superiors advised of any cases involving NBD employees. When asked why she had failed to notify her superiors of her conversation with Officer Mero, she responded that she was not required to because the investigation centered on a contract employee, not an NBD employee.

Mach made a conscious decision to disregard NBD's procedure for releasing information in order to provide Mero with the facts necessary to effect

an arrest. Certainly, the procedures were implemented to avoid an erroneous prosecution or the arrest of an innocent person. Arguably, Ms. Mach knew that the suspect was a temporary employee, yet she released information regarding a permanent employee. Consequently, a reasonable jury could conclude that by not following NBD procedure, Ms. Mach intentionally disseminated incorrect information, knowing that egregious injury was substantially certain to occur.

Unfortunately, the outrageous character of NBD's conduct in this case is not confined to Ms. Mach. Mr. Schwaller testified that he and another employee were advised not to interview or make an apology to Mr. Adams. Therefore, even if one accepts Justice Brickley's view that Ms. Mach's actions were merely negligent and that NBD should not be held liable, the corporation's decision to erect a wall of silence around Mr. Adams was without question an intentional act. The decision to maintain corporate silence was made at a time when it was clear to most that Mr. Adams was suffering emotionally from Ms. Mach's intentional delivery of incorrect information to the West Bloomfield police.[6]

Assuming, arguendo, that collective knowledge may not be imputed to a corporation unless an individual employee possesses the requisite state of mind, there is sufficient evidence to support the jury's determination that the corporation had committed, through its officers or employees, an intentional tort. Thus, under Justice Brickley's test, the corporation should be held liable for the consequences flowing from it.

[6] Three of Mr. Adams' superiors, supervisor Hazel Kemp, vice president Jean Ristagno, and assistant manager Cynthia McCree, testified that they were aware that Mr. Adams was on a medical leave and was receiving treatment for his depression regarding his arrest.

B

The theories of liability upon which the plaintiff was successful are intentional infliction of emotional distress, false arrest, and gross negligence.[7] Under Justice BRICKLEY's test, plaintiff must introduce facts necessary to prove that some individual corporate employee intentionally acted with substantial certainty that injury would occur. Any plaintiff that proves facts necessary to sustain a jury's determination of corporate liability will also prove facts necessary to escape the confines of the Workers' Disability Compensation Act, MCL 418.131; MSA 17.237(131).

Furthermore, we hasten to point out that this case was filed in 1982, and thus is a pre-1987 amendment case. Consequently, it is governed by our holding in *Beauchamp v Dow Chemical Co,* 427 Mich 1, 25; 398 NW2d 882 (1986). There, the Court stated:

> An intentional tort "is not . . . limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." It does not matter whether the employer wishes the injury would not occur or does not care whether it occurs. *If the injury is substantially certain to occur as a consequence of actions the employer intended, the employer is deemed to have intended the injuries as well.* [*Id.* at 21-22. Emphasis added.]

Justice BRICKLEY maintains that the plaintiff has failed to demonstrate that any individual had the requisite intent to satisfy a claim for an intentional tort. We disagree. The Court also maintains

---

[7] See *post* at 360.

that the plaintiff has failed to make a showing under either *Beauchamp* or § 131. *Post* at 376-377.

The elements for the intentional infliction of emotional distress are set forth in *Roberts v Auto-Owners Ins Co,* 422 Mich 594; 374 NW2d 905 (1985). We believe the plaintiff has introduced sufficient facts to satisfy the *Roberts* standard. See also *Gonyea v Motor Parks Federal Credit Union,* 192 Mich App 74; 480 NW2d 297 (1991). The leading Michigan case involving false arrest is *Lewis v Farmer Jack Div, Inc,* 415 Mich 212; 327 NW2d 893 (1982). However, the elements of false arrest are more clearly set forth in 1 Restatement of Torts, Second.[8]

### CONCLUSION

We disagree with Justice BRICKLEY's conclusion that NBD is not responsible for the intentional torts alleged and proved by the plaintiff.[9] Contrary

---

[8]    False Imprisonment

     (1) An actor is subject to liability to another for false imprisonment if

     (a) he acts intending to confine the other or a third person within boundaries fixed by the actor, and

     (b) his act directly or indirectly results in such a confinement of the other, and

     (c) the other is conscious of the confinement or is harmed by it. [1 Restatement Torts, 2d, § 35, p 52.]

In *Roberts,* this Court set forth the definition for a tort:

     (1) "extremely and outrageous" conduct,

     (2) intent or recklessness,

     (3) causation, and

     (4) "severe emotional distress." [*Id.* at 602.]

Thus, the plaintiff was required to prove by a preponderance of the evidence: (1) that NBD's conduct was extreme and outrageous, (2) that NBD's acts were intentional or reckless, (3) that such conduct of NBD was a proximate cause of Michael Adams' emotional distress, and (4) that Michael Adams suffered severe emotional distress.

[9] Justice BRICKLEY does not dispute the severity of the defendant's

to Justice BRICKLEY's position, the various events were all part of the same investigation and the same transaction. Further, there were numerous actors from whom a reasonable jury could have rationally inferred the existence of the requisite state of mind to commit an intentional tort. Therefore, the jury correctly imputed liability to the corporation, even under Justice BRICKLEY's analysis. As stated earlier, intent does not necessarily mean a hostile intent or an intent to bring about harm. Instead, intent is simply a voluntary act done with reckless disregard of consequences that are substantially certain to result from the act.

While we would affirm the decision of the Court of Appeals, because there is not a majority for that result, we join with Justices LEVIN and BOYLE in directing remand to the trial court for further proceedings regarding the plaintiff's claim of false imprisonment.

CAVANAGH, C.J., concurred with MALLETT, J.

BRICKLEY, J. We have been asked to determine whether the Court of Appeals erred in affirming a jury verdict of $1,529,154.41 for the plaintiff. The parties have presented seven issues. We will address two: (1) whether this suit is barred by the exclusive remedy provision of the Workers' Disability Compensation Act, MCL 418.131; MSA 17.237(131), and (2) whether knowledge of various employees of the defendant corporation could be amalgamated and imputed to the corporation to constitute the state of mind necessary for finding that it committed an intentional tort.[1]

We hold that the plaintiff has failed to establish

mistakes. *Post* at 379. Furthermore, neither causation nor whether the plaintiff's decedent suffered severe emotional distress are at issue. Therefore, we will not discuss either element.

[1] The remaining issues are: (3) whether the plaintiff can recover

a cause of action for intentional tort. We base this conclusion in part upon a holding that it is error to find that a corporation committed an act with a specific state of mind solely on the basis of the collective knowledge of disconnected facts possessed by employees or agents of a corporation. Furthermore, on the basis of this disposition, we find it unnecessary to reach the remaining issues. Accordingly, we reverse the judgment of the Court of Appeals, and remand the case to the circuit court for proceedings consistent with this opinion.

I

In October of 1981, Michael Bret Adams, the decedent, was erroneously arrested for making fraudulent withdrawals from the defendant National Bank of Detroit. The fraudulent withdrawals were actually made by Michael Ansara Adams, a temporary employee working for NBD. During the investigation, an NBD employee gave the West Bloomfield Township police the address and phone number of the decedent instead of the actual suspect. As a result, the decedent was arrested. Although the error was quickly discovered and the charges dropped, the decedent suffered lasting trauma, became severely depressed, was hospitalized for a period of time, and ultimately committed suicide.

wrongful death damages for decedent's suicide, (4) whether this Court will recognize the tort of intentional infliction of emotional or mental distress and whether the plaintiff presented sufficient evidence to make a prima facie case that this tort was committed, (5) whether the trial court erred in submitting plaintiff's false arrest and negligence claim to the jury, (6) whether the trial court erred in submitting the plaintiff's gross negligence and wanton and wilful misconduct claim to the jury, and (7) whether the defendant should be held liable for postjudgment interest for the period during which the court reporter delayed the production of the trial transcripts. Because of our disposition of the first two issues presented, we find it unnecessary to address these remaining ones.

In September of 1981, three unauthorized withdrawals were made from a savings account at NBD. It was discovered that the fraudulent withdrawals had been made by Michael Ansara Adams, a temporary employee working in NBD's Transportation Department. Once this theft was discovered, NBD initiated an investigation.

The inspector in charge of the investigation was Richard Michalski. Whenever NBD conducted an investigation, it was recorded and described in a loss prevention file. The loss prevention file in this case included Michael Ansara Adams' complete file from Arrow Temporary Services and included his social security number, address, home phone number, date of birth, and description. Michalski sent a report to the West Bloomfield Police; however, he did not include the date of birth or telephone number of the suspect.

In order to arrest the suspect, Officer Mero of the West Bloomfield Township Police Department called NBD to get the suspect's phone number and address. Because Michalski was unavailable, he spoke to Michalski's supervisor, Mary Miller Mach, and asked her for the information. Mach testified that because she could not find index cards that cross-indexed the file, she could not retrieve the file. She testified that she searched the desks of the investigators and secretaries in the department,[2] but never found the file. Ultimately she obtained the requested information from the

---

[2] Loss prevention files were organized numerically. In addition, the department kept a file of index cards to cross index them. There were two index cards for each investigation: One contained the name of the owner of the account that had been robbed and the other, the name of the alleged perpetrator. Both had the number of the loss prevention case. Michalski testified that, unless someone in the department was working with the cards or the file, they always were to be kept in the file cabinets. He concluded that, unless procedures were being violated, the file or the cards had to be either in the file cabinet or on the desk of the investigator or one of the five secretaries.

personnel department and from bank withdrawal records, and gave it to the officer. She testified that she asked the personnel department employee who gave her the information whether there was more than one Michael Adams working at the bank. According to Mach, that employee told her that there was only one employee by that name. However, the personnel records did not include the names of temporary employees. Mach did not ask which department Michael Adams worked in. Unfortunately, she obtained the decedent's phone number and address.[3]

Evidence was presented that Mach violated NBD procedure when she obtained the requested information from a source other than the loss prevention file. According to several security department personnel, when NBD initiated a complaint, only the investigator handling the complaint was supposed to give out information to the police, except if another investigator had the file in hand, or had personal knowledge of the case. Further, the plaintiff presented evidence that it was standard procedure in the loss prevention department for an investigator to keep his supervisor informed and for that supervisor to review the file after an investigation was started. A notation on the file indicates that Mach reviewed the file on September 29, 1981.[4] In addition, Michalski testified that he reported daily to Mach about his cases

---

[3] There was evidence presented that Mach actually may have had the loss prevention file in front of her when she was talking to Officer Mero. One page in the loss prevention file contains the decedent's home phone number, which had been partially scratched out. The plaintiff argued that because Mach was the only one who ever confused the two Michael Adams', she is the only one who would have written the phone number in the file. They argue that the presence of this phone number in the file implies that Mach had the file in front of her while talking to Mero.

[4] She testified that she did not "sit down and read every item in the file . . . . [T]hat would be impossible with the case load I have."

in progress. Despite these facts, Mach gave out the information about the wrong person. However, no evidence was presented that she did so with the intent that the wrong person be arrested.

After obtaining the information from Mach, Sergeant Mero contacted the decedent and advised him to turn himself in. When the decedent next went to work, he told his supervisor what had happened. His supervisor took him to see Richard Wolfe, the assistant vice president in charge of the item check processing group, in which the decedent worked. The decedent told Wolfe of the warrant for his arrest, and told him that he was innocent. Wolfe called the security department and described the situation to Albert Schwaller, the security manager. Schwaller called the West Bloomfield police, and they confirmed that there was a warrant for Michael Adams' arrest. Schwaller informed Wolfe,[5] who then told the plaintiff that he should report to the police station. Other employees[6] offered to accompany him, but he refused. He went to the station, where the police informed him of his rights, handcuffed him, arraigned him, and released him on a personal bond of $100. The mistake was discovered the following day, and the charges were dropped.

Michalski never apologized to the decedent, nor was he aware that anyone else had done so. Schwaller stated that the security department had been advised not to apologize or interview the decedent because he was satisfied with the explanation that had been given to him. After his

[5] Schwaller also testified that he had been aware of the investigation since it began, and that the actual suspect was a contract employee who worked in the transportation department. However, he testified that he did not remember this when Wolfe called him.

[6] These other employees were Cynthia McCree, the assistant manager, her superior Jean Ristagno, the shift officer, and Connie Rumps, another assistant manager.

arrest, the decedent suffered severe anxiety and
depression. He became withdrawn and angry and
cried frequently. He expressed anger at the bank
for the arrest. He took a long sick leave, and spent
time in both inpatient and outpatient psychiatric
programs. He committed suicide on June 2, 1982.

In the circuit court, the plaintiff[7] alleged that
the defendant had falsely arrested him, had en-
gaged in wilful and wanton misconduct, had inten-
tionally inflicted emotional distress upon him, and
had maliciously prosecuted him. The defendant
moved for accelerated judgment on the ground
that the suit was barred by the exclusive remedy
provision of the Workers' Disability Compensation
Act. The trial court denied the motion. A jury
found the defendant liable for $1,529,154.41 for
injury resulting from false arrest, negligence, gross
negligence and wilful and wanton misconduct, and
intentional infliction of emotional distress.[8] They
found no cause regarding the malicious prosecu-
tion count. The defendant appealed.

The trial court also ruled that Officer Mero and
the township were immune from suit.[9]

The Court of Appeals, in an unpublished per
curiam opinion, decided December 12, 1991
(Docket No. 112711), unanimously affirmed the
jury verdict. It found that the plaintiff's action
was not barred by either the exclusive remedy or

[7] This action was initially commenced by the decedent. After the
decedent's death, his father, Amos Adams, continued the action in his
name, along with a wrongful death claim.

[8] The jury awarded damages of $253,154.41 to the estate, $540,000
to Geraldine Adams, the decedent's mother, $236,000 to his father,
and $250,000 each to Roshone and Walter Adams, the decedent's
brothers.

[9] The trial court found that the township and Officer Mero were
immune on September 27, 1985. The Court of Appeals affirmed this
decision in an unpublished opinion (Docket Nos. 89523 and 89594).
This Court denied leave to appeal the decision, 428 Mich 904 (1987),
with Justices Archer and Levin showing that they would grant
leave.

coemployee provisions of the Workers' Disability Compensation Act, MCL 418.131(1); MSA 17.237(131)(1) and MCL 418.827(1); MSA 17.237(827)(1). Slip op, p 1. The Court reached this result for two reasons. First, it found that the exclusive remedy provision does not apply to claims arising from intentional torts. Slip op, p 2. Applying the provision embodied in MCL 418.131(1); MSA 17.237(131)(1), it found that the plaintiff had established that a deliberate act had been committed by the defendant, that the defendant had actual knowledge that an injury to Adams was certain to occur as a result of that act, and had wilfully disregarded that knowledge. *Id.* Further, it found that Adams' cause of action was unrelated to the employer-employee relationship between the defendant and decedent. *Id.* In addition, it rejected NBD's claim that the trial court erred in its instruction to the jury with regard to imputed corporate knowledge. Slip op, p 3. The Court rejected all of the defendant's other contentions, and affirmed the verdict of the trial court.

II

The defendant argues that it is error to allow a jury to combine the knowledge of disconnected facts possessed by individual employees and to impute this knowledge to a corporation to find it liable for intentional torts.[10] It claims that the

[10] The plaintiff claims that this alleged error was not preserved for review. It is undisputed that the defendant objected to the instruction; however, the plaintiff argues that that the objection was made on incorrect grounds. We find that it is unnecessary to determine whether the error was properly preserved. While appellate review of such an error is usually foreclosed, such an error may be reviewed to prevent manifest injustice. The trial judge's instruction, summarized below, would have allowed the jury to find that a corporation can be deemed to possess a certain state of mind based on imputed, disconnected facts. Because this is one of the most fundamental and control-

plaintiff must show that some employee of the defendant acted with the state of mind necessary to find that it committed such acts.[11]

With regard to the issue of the knowledge of a corporation, the trial judge gave the following instruction:

> A corporation is liable for the acts or failure to act of its officers, employees or agents, in the performance of their duties.
>
> When a person representing a corporation is doing a thing which is in connection with and pertinent to that part of the corporation business which he is employed or authorized or selected to

---

ling issues in the case and review is necessary to determine whether the defendant actually committed intentional torts, we will review it. See *Riddle v McLouth Steel Products,* 440 Mich 85, 101, n 15; 485 NW2d 676 (1992); *Hunt v Deming,* 375 Mich 581; 134 NW2d 662 (1965).

[11] In support of its argument, the defendant cites *Smith v General Motors Corp,* 192 Mich App 652; 481 NW2d 819 (1992). In *Smith,* the decedent was killed by a malfunctioning machine at the defendant's plant. The plaintiff presented evidence that various employees knew that the machine needed to be modified to be operated safely and that it had not been modified. However, no employee had all of this information. *Id.,* pp 655-656. The plaintiff claimed that the defendant had committed an intentional tort. She claimed that, because the corporation is charged with the combined knowledge of its employees, its failure to correct the defect in the machine constituted wilful disregard. The Court of Appeals acknowledged that the combined knowledge of corporate employees may be imputed to a corporation, citing *Upjohn Co v New Hampshire Ins Co,* 438 Mich 197; 476 NW2d 392 (1991). However, the Court stated that finding that the corporation possessed a state of mind that satisfies the standard of § 131 required more than a showing of knowledge or notice. It held:

> A corporation may be liable for an intentional tort. *To find the requisite intent, however, there must be a human who acted with that intent in order to hold the corporation responsible.* . . . Plaintiff's analysis fails to consider the fact that no employee of defendant had the requisite state of mind that could be imputed to defendant. [*Id.,* p 657. Emphasis added. Citation omitted.]

Defendant argues that this statement of the law is correct.

do, then that which is learned or done by that person pursuant thereto, is in the knowledge of the corporation.

*The knowledge possessed by a corporation about a particular thing is the sum total of all of the knowledge which its officers and agents were authorized and charged with the doing of a particular thing acquired,* while acting under and within the scope of their authority. [Emphasis added.]

The plaintiff argues that this instruction is correct.

This Court has recognized the rule embodied in the trial judge's instruction in *Upjohn Co v New Hampshire Ins Co,* 438 Mich 197; 476 NW2d 392 (1991). In *Upjohn,* the issue was whether the defendant was obligated to indemnify Upjohn for damages and expenses arising from leaks from underground storage tanks holding toxic chemicals. The specific question was whether the discharge of chemicals was "sudden" and "accidental" as required by the policy. This Court found that it was not and held that Upjohn should have expected that the tanks were leaking. We based this conclusion on the fact that Upjohn's records indicated that readings on fluid levels in the tank showed levels that did not coincide with the amount of fluid being pumped into the tank. *Id.,* pp 201-203. This Court found that, on the basis of these recorded fluid levels, Upjohn had sufficient information available to cause it to expect the release of chemicals from the tanks even though the reduced levels did not alone indicate a leak. *Id.,* pp 212, 214. In support of this conclusion, we cited the rule that a corporation is held to possess the collective knowledge of its employees and that it cannot plead ignorance on the ground that no employee possessed all relevant knowledge so as to

be able to realize its import. *Id.,* pp 213-214.[12] The
rule was adopted by this Court in *Upjohn* and is
essentially identical to the language of the trial
judge's instruction in this case.[13]

This same rule has been applied by other courts
to establish corporate criminal guilt. A leading
case upon which we based our decision in *Upjohn,*
is *United States v TIME-DC, Inc,* 381 F Supp 730
(WD Va, 1974). In *TIME-DC,* the defendant truck-
ing company was charged with violating the Inter-
state Commerce Act, which prohibited drivers
from operating a motor vehicle when their ability
to drive was impaired. To prove a violation of this
act, it was necessary to prove that the defendant
acted knowingly and wilfully. The court held that
the corporation was deemed to hold the collective
knowledge of its employees. *Id.,* p 738. Thus, be-
cause various employees collectively held informa-
tion that indicated that a certain employee would
violate the law if he drove, the corporation was
deemed to know this. *Id.,* p 739. Furthermore, the
court cited the proposition that a defendant is
deemed to have knowledge of a regulatory viola-
tion if the means were present to detect the infrac-
tion. *Id.* The court also found that the defendant
acted wilfully. First, it noted that in order to find
a violation of a regulatory statute, it was not
necessary to prove "an evil purpose or specific
criminal intent in order to establish willfulness."
*Id.,* p 740. Rather, it was enough to show that the
defendant had disregarded the statute or was

[12] The Court of Appeals has also recognized and applied this rule.
See, e.g., *People v American Medical Centers,* 118 Mich App 135; 324
NW2d 782 (1982); *Gordon Sel-Way, Inc v Spence Bros, Inc,* 177 Mich
App 116; 440 NW2d 907 (1989), aff'd in part and rev'd in part on
other grounds 438 Mich 488; 475 NW2d 704 (1991).

[13] The trial judge based his instruction on language from *Copeman
Laboratories Co v General Motors Corp,* 36 F Supp 755, 762 (ED Mich,
1941). In *Upjohn,* p 214, we relied upon the same case.

"plainly indifferent" to its requirements and that the evidence had shown this. *Id.,* p 741. It based this conclusion in part on a finding that the defendant had designed and implemented its absence policy in a manner that encouraged drivers to drive when ill. *Id.*

In general, it is appropriate to consider the collective knowledge of a corporation to determine whether a corporate defendant has committed a crime. See *United States v Bank of New England,* 821 F2d 844, 856 (CA 1, 1987), cert den 484 US 943 (1987),[14] and citations therein. This rule recognizes that the structure of corporations is such that they tend to compartmentalize knowledge. The aggregate of these components is the corporation's knowledge. Without a collective knowledge rule, corporations could shield themselves from responsibility for the information they possess by dividing knowledge and then claiming that no employee was aware of all relevant information. We recognize the appropriateness of this rule in many settings. Basing criminal liability upon collective

[14] In *Bank of New England,* the bank was convicted of violating the Currency Transaction Reporting Act by failing to report lump-sum transfers of cash that exceeded $10,000. In order to show a violation, it had to be proven that the defendant knowingly and wilfully violated the act. The trial judge instructed the jury that knowledge could be proven either by showing that one employee knew of the reporting requirements or by showing that one employee knew one facet of the requirements, and others knew other facets, and thus that, combined, they were aware of the reporting requirements. Further, the judge instructed that the bank could be found to have acted wilfully if any employee acted wilfully, or if the bank as an organization consciously avoided learning about and observing the act's requirements, and avoided informing its employees of its requirements. *Id.,* p 855. The court approved the trial judge's instructions, finding that the collective knowledge instruction was appropriate. Further, it approved the instruction regarding intent, noting that wilfulness in the context of federal statutory violations could be shown by demonstrating indifference to the requirements. *Id.* However, the court ultimately found sufficient evidence that the bank had acted wilfully on the basis of evidence that individual employees acted wilfully. *Id.,* p 857.

knowledge is appropriate in cases like *TIME-DC,* because proving violations of the regulations only necessitates a showing that the corporation was aware or had the means to be aware that its employees were violating the law. Similarly, this rule was appropriate in *Upjohn* because all that needed to be shown was that the corporation knew it was possible that the storage tanks were leaking. In contrast, showing that a corporation committed an intentional tort requires something more than mere knowledge. As one commentator has noted:

> The intent with which tort liability is concerned is . . . an intent to bring about a result which will invade the interests of another in a way that the law forbids. [Prosser & Keeton, Torts (5th ed), § 8, p 36.]

The defining characteristic of an intentional tort is an awareness that the act is being committed and an intent to invade the interests of another. Proof of this awareness and intent does not necessarily follow from a showing that the corporation possessed knowledge.

We note that some courts have recognized the flaw in the logic of deeming a corporation to intend an act on the basis of collective knowledge. For example, the United States District Court for the Southern District of New York has held, with respect to a fraud claim, that a corporation only can be held to have a particular state of mind when it is possessed by an individual. *First Equity Corp of Florida v Standard & Poor's Corp,* 690 F Supp 256, 260 (SD NY, 1988), aff'd 869 F2d 175 (CA 2, 1989). In *United States v LBS Bank,* 757 F Supp 496 (ED Pa, 1990), in determining whether a corporation was guilty of conspiracy to defraud the government, the United States District Court for

the Eastern District of Pennsylvania stated that specific intent cannot be aggregated in the same manner that knowledge can. Rather, in order to sustain the verdict, it was necessary to show that at least one agent of the defendant possessed that specific intent. *Id.,* p 501, n 7. See also 18B Am Jur 2d, Corporations, § 2129, pp 950-952.[15]

Furthermore, cases in which courts have imputed intent to a corporation support our conclusion. For example, in *People v American Medical Centers,* 118 Mich App 135, 140; 324 NW2d 782 (1982), a medical clinic was convicted of medical fraud. Although the Court noted the collective knowledge rule of *TIME-DC, supra,* and stated that the combined knowledge of the employees could be imputed to the corporation to find it liable for fraudulent acts, it based its conclusion on evidence that the individual employees intended to commit fraud. *Id.,* p 156. In *United States v Shortt Accountancy Corp,* 785 F2d 1448 (CA 9, 1986), cert den 478 US 1007 (1986), the court affirmed an accounting firm's conviction for making and subscribing false tax returns. It found that one employee who actually subscribed some of the returns did not have the intent to file a false return, but that another employee, who caused the first employee to do so, did have the requisite intent. That intent was imputed to the corporation. *Id.,* p 1454.

[15] It is now well settled that a corporation may be liable for a malicious tort or wrongful act of its officer or agent. These authorities repudiate the view that a corporation, being an artificial person, could not act from malice or have a malicious or other intent and therefore could not be liable for a tort which required a motive and intention. The malice of the corporation consists of the motives which prompt the action of its representatives; the requisite state of mind must necessarily be that of its employee or agent. [18B Am Jur 2d, Corporations, § 2129, pp 950-951.]

We find these authorities persuasive. Although much of the law of corporations is based on legal fictions, we find that deeming a corporation to intend to commit a tortious act solely on the basis of imputed disconnected facts is a fiction that conflicts with the basic principles underlying the law of intentional torts. Such a rule would allow proof of such torts without requiring a showing that the necessary state of mind existed. While a corporation can be deemed to "know" something on the basis of collective knowledge, it does not follow from a showing of such knowledge that it can "intend" an act. Inventing this kind of consciousness simply defies reason.

We do not find that the collective intent instruction is erroneous per se. Rather, we hold that it is erroneous to use it to find the defendant guilty of an intentional tort. In order to find that intentional torts have been committed, it must be shown that the tortfeasor has the necessary state of mind. Under the collective knowledge standard, we can conclude that the defendant corporation knew that Michael Ansara Adams was the real suspect because some of its employees were aware of this. We can conclude that it knew that the decedent was not the suspect for the same reason. However, we cannot deem the corporation to have possessed the necessary *intent* to have committed *intentional* torts on the basis of this logic.

Accordingly, while we recognize that the collective knowledge instruction may be appropriate in other contexts, such as when determining whether a corporation was negligent, or whether it committed a crime, we find that it is error to allow a jury to rely upon it to establish the state of mind requisite to the commission of an intentional tort of a corporation. We hold that intent to commit tortious acts cannot be imputed to a corpora-

tion on the basis of disconnected facts possessed by various employees or agents of that corporation, where there is no evidence that any employee possessed the requisite state of mind.[16]

### III

The next question we must address is whether the exclusive remedy provision of the Workers' Disability Compensation Act bars the plaintiff's action. The defendant argues that the plaintiff's suit should be barred by the WDCA because the sole remedy for the injuries suffered by the decedent should be workers' compensation benefits. The Court of Appeals found that the suit was not barred, both because the plaintiff had alleged intentional torts and because the decedent's injuries did not arise "out of and in the course of" his employment. The WDCA provides:

> An employee, who receives a personal injury *arising out of and in the course of employment* by an employer who is subject to this act at the time of the injury, shall be paid compensation as provided in this act. [MCL 418.301(1); MSA 17.237(301)(1). Emphasis added.]

In order for an injury to be compensable, it must arise out of and in the course of employment. If an injury does not, then it is not compensable under the workers' compensation scheme. However, when an employee receives a personal injury during the course of his employment, the WDCA is meant to be his sole remedy. The WDCA further provides:

---

[16] While we acknowledge that, under some circumstances, a corporation may be liable for the intentional torts committed by its agents, because this case does not present such a situation, we decline to determine what fact situations would lead to such a conclusion.

> The right to the recovery of benefits as provided in this act shall be the employee's *exclusive* remedy against the employer for a personal injury or occupational disease. [MCL 418.131(1); MSA 17.237(131)(1), 1987 PA 28, § 1. Emphasis added.]

This Court has stated that "the language [of the act] expresses a fundamental tenet of workers' compensation statutes that if an injury falls within the coverage of the compensation law, such compensation shall be the employee's only remedy . . . ." *Farrell v Dearborn Mfg Co,* 416 Mich 267, 274; 330 NW2d 397 (1982). See also *Szydlowski v General Motors Corp,* 397 Mich 356, 358; 245 NW2d 26 (1976).

### A

The first issue to be addressed is whether the trial court had jurisdiction to determine that the exclusive remedy provision did not bar this suit on the basis that decedent's injuries did not arise out of and in the course of his employment.

This Court has addressed this issue in *Szydlowski, supra.* While undergoing treatment for work-related injuries, the plaintiff in that case died as a result of drugs that were improperly administered by his employer. The Court held that whether the plaintiff's death arose out of employment could only be determined by the workers' compensation bureau. *Id.,* p 359. Although this Court has narrowed the scope of this rule in subsequent cases, when the issue is whether injuries arose "out of and in the course of employment," the rule remains unchanged: the bureau must make the initial determination. See *Sewell v Clearing Machine Co,* 419 Mich 56, 62; 347 NW2d 447 (1984); see also

*Boscaglia v Michigan Bell Telephone Co,* 420 Mich 308, 321, n 17; 362 NW2d 642 (1984).[17]

The Court of Appeals has decided many cases that deal with this issue. It has been stated by more than one panel that in cases in which it is *clear* that the employer-employee relationship between the parties is unrelated to the cause of action, the cause of action may be commenced in circuit court without an initial determination by the bureau. See *Genson v Bofors-Lakeway,* 122 Mich App 470, 474; 332 NW2d 507 (1983).[18] *Jones v General Motors Corp,* 136 Mich App 251, 254-255; 355 NW2d 646 (1984).

The logic of the rule articulated by the Court of Appeals is appealing; however, we find it unnecessary to determine whether this Court should adopt it because it is unclear whether the injuries suffered by the decedent in this case arose out of his employment. We observe that a nexus of some sort exists between the decedent's injury and his employment. It is not for this Court to determine whether this nexus is sufficient to bring the injuries suffered under the coverage of the WDCA. Under these circumstances, that determination must be made by the bureau.

The plaintiff asserts that the defendant should be estopped from claiming that the decedent's injuries arose out of and in the course of employment and bases this argument on the fact that, while the decedent was on medical leave following

---

[17] In *Sewell,* a question arose regarding whether the defendant was actually the plaintiff's employer, and thus able to invoke the exclusive remedy provision of the WDCA. This Court held that the circuit court had jurisdiction to make this determination. *Id.,* p 58. Although *Sewell* acknowledged *Szydlowski,* and the rule articulated therein, it held that the courts still have the power to decide more "fundamental issue[s]," such as whether the parties are employers or employees. *Id.,* p 62.

[18] Overruled on other grounds in *Beauchamp v Dow Chemical,* 427 Mich 1; 398 NW2d 882 (1986), discussed *infra,* pp 374-376.

his arrest, the defendant filed a "notice of dispute" with the bureau. With this notice, defendant indicated that it would be disputing any claim that Adams might make for workers' compensation because the alleged injury *did not* arise out of or in the course of employment. However, the defendant subsequently reversed its position and claimed that the plaintiff should be confined to whatever recovery may be available under workers' compensation because his injuries *did* arise out of and in the course of his job. The plaintiff asserts that, as a result of this notice, Adams never made a request for workers' compensation benefits. Thus, the plaintiff argues that the defendant should have been estopped from changing its position.

Equitable estoppel "arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts." *Lichon v American Ins Co,* 435 Mich 408, 415; 459 NW2d 288 (1990), quoting *Fleckenstein v Citizens Mutual Automobile Ins Co,* 326 Mich 591, 599-601; 40 NW2d 733 (1950). The United States Court of Appeals for the Sixth Circuit has stated that "[c]ourts apply equitable estoppel to prevent a party from contradicting a position taken in a prior judicial proceeding." *Edwards v Aetna Life Ins Co,* 690 F2d 595, 598 (CA 6, 1982).[19] Judicial estoppel, on the other hand, prevents a party who has successfully and

---

[19] The *Edwards* court was explicitly applying estoppel principles embodied in federal law. *Edwards,* p 598, n 4. However, this Court has cited the *Edwards* court's definitions of the various kinds of estoppel with approval. See *Lichon, supra,* p 416.

unequivocally asserted a position in a prior proceeding from asserting an inconsistent one at a subsequent proceeding. *Lichon, supra,* p 416. Neither of these doctrines apply in this case because the defendant's assertion did not occur in the context of prior proceedings. The defendant merely asserted a defense in anticipation of potential workers' compensation proceedings. Further, there is no evidence that the defendant's actions actually induced the plaintiff to refrain from claiming workers' compensation benefits. Accordingly, we find that the filing of this notice of dispute does not estop the defendant from asserting that the decedent's injuries arose out of and in the course of his employment.

B

This Court has determined, and our Legislature has expressly provided, that an employee's suit against his employer for intentional tort is not precluded by the WDCA. The question we must now address is whether the exclusive remedy bar applies in view of the circumstances presented. Section 13 of the WDCA currently provides:

The right to the recovery of benefits as provided in this act shall be the employee's exclusive remedy against the employer for a personal injury or occupational disease. *The only exception to this exclusive remedy is an intentional tort.* An intentional tort shall exist only when an employee is injured as a result of a deliberate act of the employer and the employer *specifically intended an injury.* An employer shall be deemed to have intended to injure if *the employer had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge.* The issue of whether an act was an intentional tort shall be a question of law for the court. This subsection shall

not enlarge or reduce rights under law. [MCL 418.131(1); MSA 17.237(131)(1), 1987 PA 28, § 1. Emphasis added.]

This portion of the exclusive remedy provision was added in 1987. The provision was amended in response to this Court's decision in *Beauchamp v Dow Chemical Co,* 427 Mich 1; 398 NW2d 882 (1986).

*Beauchamp* addressed for the first time the question whether the then-existing exclusive remedy provision of the WDCA barred an employee's action for an intentional tort. We found that it did not, and held that whether a tort was intentional was to be determined by applying the "substantial certainty" standard. *Id.,* p 25. Under this standard, the employee had to show that the employer intended the act that caused the injury, and knew that injury was substantially certain to occur as a result of the act. *Id.,* pp 21-22. In response, the Legislature amended the WDCA, and supplied the language that currently exists. The amendment provides that intentional tort actions are not barred by the WDCA, but also establishes a stricter test to determine whether an intentional tort has been committed: The employee must show that the employer not only intended the act that caused the injury, but that the employer specifically intended an injury. MCL 418.131(1); MSA 17.237(131)(1). However, an employer will be deemed to have intended an injury if it had actual knowledge that an injury was certain to occur and wilfully disregarded that knowledge. *Id.*

The cause of action in this case arose before these amendments were enacted. However, the plaintiff prevailed in both the circuit court and the Court of Appeals under the standard articulated in § 131, and only on appeal in this Court is it argued

that the *Beauchamp* standard should apply. We find it unnecessary to determine which standard governs this case. We conclude that under either standard, the plaintiff has failed to establish an intentional tort.

The plaintiff alleged (1) that the defendant falsely accused the decedent of committing larceny through false pretenses and that it falsely imprisoned him, (2) that it maliciously prosecuted him, (3) that it intentionally inflicted emotional distress, and (4) that it was negligent, grossly negligent, and engaged in wilful and wanton misconduct. In support of count one, the plaintiff alleged that the defendant unjustly and falsely accused him of a crime and that it restrained and detained him against his will without reasonable cause. In support of count two, the plaintiff alleged that the criminal charges against him were malicious and without probable cause, and were dismissed in his favor. In support of count three, the plaintiff alleged that the defendant's conduct was abusive and outrageous, and was an intentional invasion of his mental and emotional tranquility.

Although the plaintiff alleged intentional torts, the facts of this case, even taken in a light most favorable to the plaintiff, do not establish them. The plaintiff has not established that the defendant possessed the requisite state of mind. The plaintiff can show that the corporation had the knowledge that Michael Ansara Adams was the suspect in the fraudulent withdrawals. He can show that the corporation had the knowledge that Michael Bret Adams was not the suspect. However, it simply cannot be shown that the defendant corporation intended to provide the decedent's name, and was substantially certain that injury would result, as *Beauchamp* requires. *Id.,* pp 20-21. Nor can it be shown that the defendant corpora-

tion deliberately provided the wrong name, and *wilfully* disregarded actual knowledge that injury was certain to occur, as is required by § 131. The plaintiff simply cannot prove the requisite awareness, intention, or wilful disregard.

The plaintiff urges, in the alternative, that the necessary state of mind can be found in individual employees of the defendant. The plaintiff introduced extensive evidence that showed that Mach had at some point been aware that the real suspect was a temporary employee named Michael Ansara Adams because she had reviewed the file and Michalski had described the investigation to her. Nevertheless, she retrieved the decedent's phone number and address and gave it to the police. In addition, the plaintiff introduced evidence that, even though the decedent informed high-ranking employees of the defendant that he was not the culprit, and they had been apprised of, and had access to, information that confirmed his assertions, they still directed him to the West Bloomfield police. The plaintiff argues that this evidence demonstrates that these individual employees possessed the requisite state of mind to find that they committed intentional torts, and that that state of mind can be imputed to the corporation.

However, the plaintiff has failed to make a showing that any of these individuals had the requisite intent necessary to prove the commission of intentional torts. As we noted, under *Beauchamp*, to overcome the exclusive remedy bar, it must be shown that the defendant intended the act that caused the decedent's injuries, and was substantially certain that injury would result from that act. Under § 131, as amended, it would have to be shown that the defendant committed a deliberate act, knowing that injury would result, and

then wilfully disregarded that knowledge. The plaintiff has not satisfied either threshold.

The act that set the events in motion that caused the decedent's injuries was providing his phone number and address to the police. While the evidence clearly shows that Mach intended to give a name to the police, there is no evidence that she intended to give *the decedent's* name.

Although the plaintiff presented evidence that Mach had been informed that the actual suspect was a contract employee, and had been given other information that should have alerted her that she was providing information about the wrong person, plaintiff did not show that Mach was aware of this fact when she gave the information to the police.[20] There is no evidence that she intended that the defendant be wrongfully arrested. Indeed, there is no evidence that she even knew who he was.

We acknowledge that the plaintiff presented evidence from which the jury was entitled to infer that Mach had the file with all the information in front of her when she was speaking to Officer Mero. However, we find this inference alone insufficient to sustain a finding that she intentionally provided the decedent's name with the awareness that he was not the target of the investigation. Contrary to the assertions of Justice MALLETT, we do not suggest that in order for a person to commit an intentional tort, the person must "intend or desire the explicit or precise outcome that arises from his tortious act." *Ante,* p 350. How-

[20] Justice MALLETT asserts that "a jury may reasonably infer from the facts that Mach knowingly and intentionally gave out erroneous information because she knew that the suspect was a temporary employee." *Ante,* p 351. On the contrary, we find that such an inference is unreasonable in the absence of any evidence of a possible motive for such an act or even any evidence that Mach knew who the decedent was.

ever, as Justice MALLETT acknowledges, the conse-
quences of an act must be substantially certain to
occur. The evidence does not show that Mach
possessed the requisite certainty that injury would
result. Both *Beauchamp* and § 131 require a spe-
cific degree of awareness that an injury will occur.
However, the plaintiff presented no evidence that
Mach was aware that injury would result from her
actions when she gave out the number.

We note that plaintiff presented evidence that
Mach intentionally violated the NBD policy govern-
ing disclosure of evidence to the police when she
obtained the decedent's phone number and address
from the personnel records. However, contrary to
the assertions of Justice MALLETT, this alone is not
proof that she committed an intentional tort. Al-
though such a policy is designed in part to prevent
erroneous arrests like that in this case, the fact
that Mach intentionally violated it still is not
sufficient to make the necessary showing. Argu-
ably, she should have been aware of the possibility
that something like this could happen if she gave
out information without the file. However, demon-
strating a violation of the policy does not amount
to a showing that she was substantially certain, or
was actually certain and wilfully disregarded the
knowledge that the decedent's injuries would re-
sult from that violation. Violating a policy like
this one alone cannot be the basis for intentional
tort liability. If a person intentionally breaks the
speed limit while driving on a wet road and then
collides with another car, he has not committed an
intentional tort, even though he has intentionally
broken the law. In such a situation, although the
driver should be aware that speed limits are de-
signed in part to prevent accidents, and that acci-
dents are likely to occur when drivers speed on
wet roads, the outcome is not so certain that the

driver is deemed to intend the resulting accident.
The same logic applies in this situation. Although
Mach should have been aware that the informa-
tion disclosure policy was in part designed to avoid
erroneous arrests, and that ignoring the policy
could *possibly* lead to such an arrest, the evidence
does not show that she was substantially certain
that an erroneous arrest would occur from her
violation of the policy. Thus, she cannot be deemed
to intend the arrest solely on the basis of her
violation of the policy.[21]

Nor does the evidence establish that Schwaller
or Wolfe committed intentional torts. Although
the plaintiff presented evidence that they had
access to information that showed that the dece-
dent was not the suspect in the case, and that they
were informed by the decedent that he was inno-
cent, there is no evidence that, at the time they
directed him to the police station, they were aware
that he was not the actual suspect. The evidence
does not indicate that they sent him to the police
with the intent that he be wrongfully arrested, or
that they had any idea that he would be injured
by their actions, let alone that they had any
certainty that he would be. Indeed, with regard to
all the employees in question, the evidence
strongly indicates that the only reason this errone-
ous arrest ever occurred is that the employees of
the defendant did not realize the mistake they
were making. The evidence shows that NBD's em-
ployees made errors, albeit grave ones with tragic
consequences. Although arguably the plaintiff pre-
sented evidence that proved that these employees
were negligent, he presented evidence insufficient

[21] As one commentator notes, "The line [between intent and negli-
gence] has been drawn by the courts at the point where the known
danger ceases to be only a foreseeable risk which a reasonable person
would avoid, and becomes in the mind of the actor a substantial
certainty." Prosser, *supra,* p 36.

to sustain a finding that these individuals had the necessary state of mind to find that they committed intentional torts.

Justice MALLETT asserts that the "corporation's decision to erect a wall of silence around Mr. Adams was without question an intentional act." *Ante,* p 352. The only evidence of such a decision is Schwaller's statement that he was instructed not to apologize to the decedent because the decedent was satisfied with the explanation that had been given to him. Indeed, Schwaller testified that he did not apologize. In addition, both Michalski and Mach testified that they did not apologize. However, Cynthia McCree, an assistant manager, and Jean Ristagno, her superior, both testified that they and other employees of the defendant made many attempts to comfort and reassure the decedent, both before and after the arrest. Although some employees of the defendant did not apologize, it is a mischaracterization of the evidence to suggest that there was a wall of silence around the decedent. Furthermore, while it is certainly insensitive and foolish for the defendant not to have offered a formal apology to Michael Adams, this failure, which is essentially a passive response, cannot fairly be characterized as an act that is substantially certain to result in the kind of severe emotional distress that the decedent ultimately suffered.

Justice LEVIN asserts that the exclusive remedy provision of the WDCA does not bar the plaintiff's false imprisonment claim. He opines that the WDCA only applies to physical and mental injuries. *Ante,* p 334. He further asserts that the basis of a false imprisonment claim, interference with the liberty interest, is neither a physical nor mental injury. Thus, he concludes that it is not covered by the WDCA. *Ante,* p 336.

The exclusive remedy provision provides a test for courts to use to determine whether a civil action is barred by the WDCA.[22] As discussed above, the exclusive remedy provision currently provides that "[t]he right to the recovery of benefits as provided in this act shall be the employee's exclusive remedy against the employer for a personal injury or occupational disease. The only exception to this exclusive remedy is an intentional tort." MCL 418.131(1); MSA 17.237(131)(1), as amended by 1987 PA 28. Furthermore, the statute provides that, for the purposes of the exclusive remedy provision, an intentional tort occurs only when an employee is injured by a deliberate act of the employer, when the employer specifically intended an injury. *Id.* An employer is deemed to intend an injury if the employer had actual knowledge that injury was certain to occur and wilfully disregarded that knowledge. *Id.* Neither this statute nor the applicable Michigan case law contains any suggestion that it would be appropriate to supplement this test with individual definitions of specific intentional torts from the common law or treatises.

Furthermore, the authorities that Justice LEVIN cites in support of these propositions are not persuasive. We decline to follow the decisions of our sister state courts, interpreting their own workers' compensation statutes, on this particular issue. In support of his conclusion that an action for false imprisonment is not barred by the WDCA, Justice

[22] The exclusive remedy provision that was in effect at the time of the events in question provided that "[t]he right to the recovery of benefits as provided in this act, shall be the employee's exclusive remedy against the employer." MCL 418.131; MSA 17.237(131), as added by 1969 PA 317. As discussed above, this Court, in *Beauchamp, supra,* interpreted this section as not barring actions for intentional torts. The *Beauchamp* Court described an intentional tort as resulting when an employer intends an act that causes an injury, and knows that injury was substantially certain to occur as a result of the act. *Beauchamp, supra,* pp 21-22.

Levin cites cases from California,[23] Delaware,[24] Massachusetts,[25] and Utah.[26] However, none of the workers' compensation statutes that these courts were interpreting had exclusive remedy provisions similar to ours. Unlike Michigan's statute, none of those states' workers' compensation statutes contain specific, catch-all intentional tort exceptions to their exclusionary provisions. Nor do any of those statutes contain definitions of what constitutes an intentional tort for the purposes of their exclusionary rules.[27] Thus, we do not find that these cases support the result reached by Justice Levin.

Nor do we find the reasoning of *Moore v Federal Dep't Stores,* 33 Mich App 556; 190 NW2d 262 (1971), persuasive. *Moore* predated not only the current amendment of the exclusive remedy provision, but also this Court's opinion in *Beauchamp, supra.* Our *Beauchamp* decision was intended to clear up the confusion surrounding the issue whether suits for intentional torts were barred by the WDCA. A number of Court of Appeals cases predating *Beauchamp,* including *Moore,* had addressed this issue, with mixed and conflicting results.[28] Furthermore, the *Moore* Court based its decision in part upon a section of the WDCA that no longer exists.[29] *Id.,* p 560. Because this Court has decided cases that have dramatically changed workers' compensation law in this area, and be-

---

[23] *Howland v Balma,* 143 Cal App 3d 899; 192 Cal Rptr 286 (1983).

[24] *Battista v Chrysler Corp,* 454 A2d 286 (Del Super, 1982).

[25] *Foley v Polaroid Corp,* 381 Mass 545; 413 NE2d 711 (1980).

[26] *Mounteer v Utah Power & Light Co,* 823 P2d 1055 (Utah, 1991).

[27] See Cal Labor Code 3602; 19 Del Code Ann 2304; Mass Gen Laws Ann, ch 152, § 23; Utah Code Ann 35-1-60.

[28] See *Beauchamp, supra* at 11, and the cases cited therein.

[29] The part of the act relied upon by the *Moore* Court was superseded by the exclusive remedy provision that was in effect at the time the decision in *Beauchamp, supra* was rendered. 1969 PA 317. See also n 22.

cause the Legislature has amended the statute since the *Moore* decision, we find that the analysis therein no longer is vital.

Further, we question whether it is correct to conclude that the injury underlying a false arrest claim is not covered by the WDCA. There is no language in the statute that compels such an interpretation. No cases from this Court have so held, and we decline to do so in this case. It would be a remarkable pronouncement that a test that is currently based on the state of mind of the perpetrator should be converted to a test that is based upon the nature of the injury.

IV

Accordingly, we hold that, in determining whether a corporation has committed an intentional tort, the collective knowledge of the corporation's employees cannot be amalgamated to establish the requisite intent, when no employee or agent possesses that state of mind. The evidence did not establish that any employee possessed the requisite state of mind; thus, the trial court erred in finding that the exclusive remedy provision of the WDCA did not bar this action. Furthermore, we hold that the lower courts did not have jurisdiction to determine whether the decedent's injuries arose out of and in the course of employment. Thus, they erred in exercising jurisdiction over the plaintiff's tort claims, in the absence of a finding by the WCAB that the injuries did not arise out of and in the course of employment. Therefore, we reverse the decisions of the Court of Appeals and the trial court, and remand the case to the circuit court for proceedings consistent with this opinion.

RILEY and GRIFFIN, JJ., concurred with BRICKLEY, J.